5 P.2d 259

A TUMBLING–T RANCHES, an Arizona general partnership; Russell Badley Farms, Inc., an Arizona corporation; Rosemary L. Edwards, individually and as Trustee of the Rosemary L. Edwards Trust; John E. Fornes, Jr. and Shelley Fornes, husband and wife; PJ Farms

---

Limited Partnership, an Arizona limited partnership; J & A Fornes, II, an Arizona general partnership; Marion Getzwiller and Polly Getzwiller, husband and wife; Delmar John and Jean John, husband and wife, d/b/a Delmar John Farms; BDJ Farms, L.L.C., an Arizona limited liability company; Gila River Farms, Inc., an Arizona corporation; Roy Pierpoint and Ella Pierpoint, husband and wife; Pierpoint Farms, Inc., an Arizona corporation; and Wood Brothers Farms, an Arizona general partnership, Plaintiffs–Appellants,

v.

PALOMA INVESTMENT LIMITED PARTNERSHIP, a limited partnership; Prudential Insurance Company of America, a New Jersey corporation; Maricopa Land, Inc., an Arizona corporation; Paloma Ranch Joint Venture, a joint venture; Bookman Edmonston Engineering, Inc., a California corporation; Maricopa County Flood Control District, a body politic; Maricopa County, a body politic, Defendants–Appellees.

No. 1 CA–CV 98–0605.

Court of Appeals of Arizona, Division 1, Department E.

May 2, 2000.

Jennings, Strouss & Salmon, P.L.C. by John J. Egbert, Phoenix and Kinerk, Beal, Schmidt & Dyer, P.C. by Burton J. Kinerk, Tucson, and Law Offices of Reed King by Reed King, Phoenix, Attorneys for Plaintiffs–Appellants.

Helm & Kyle, Ltd. by John D. Helm, Sarah A. Worthington, and Lorrie L. Luellig, Tempe, Attorneys for Defendant–Appellee Maricopa County Flood Control District.

Teilborg, Sanders & Parks by John C. Gemmill and Kendall D. Steele, Phoenix, Attorneys for Defendants–Appellees Prudential Insurance Co. of America and Paloma Ranch Joint Venture.

Mesch, Clark & Rothschild, P.C. by J. Emery Barker and Scott H. Gan, Tucson, Attorneys for Defendant–Appellee Paloma Investment Limited Partnership.

## OPINION

NOYES, Judge.

¶ 1 Appellants, owners of farms located along the Gila River, brought this action to recover for damages they suffered during the 1993 flooding of the river. Appellants alleged that Paloma Investment Limited Partnership, Prudential Insurance Company of America, Maricopa Land, Inc., Paloma Ranch Joint Venture, Bookman–Edmonston Engineering, Inc., and Maricopa County,[1] by virtue of their maintenance, ownership, and control of Gillespie Dam and adjacent land and stream beds, and the Maricopa County Flood Control District ("FCD"),[2] by virtue of its construction of an upstream clearing and pilot channel project, caused water and sediment to be diverted, obstructed, or rerouted through Appellants' properties, resulting in significant damage to real and personal property. Appellants appeal from the trial court's grant of summary judgment in favor of Appellees. We have appellate jurisdiction pursuant to Arizona Revised Statutes Annotated section 12–2101(B) (1994).

### I.

¶ 2 We view the facts and all reasonable inferences therefrom in the light most favorable to the parties opposing summary judgment. *See Orme Sch. v. Reeves,* 166 Ariz. 301, 309–10, 802 P.2d 1000, 1008–09 (1990). Gillespie Dam is a concrete and steel structure approximately 1700 feet long and 20 feet high. It was constructed on the Gila River in 1921 as an irrigation diversion dam. Appellants' properties lie along a thirty-seven mile stretch of the river, extending from a point approximately one and one-half miles below the dam on the north to the Painted Rock Reservoir on the south.

¶ 3 Gillespie Dam's reservoir filled with silt and sediment up to its crest shortly after it was completed. The sediment formed a triangular wedge approximately 1700 feet wide and 20 feet deep at the face of the dam that tapered off five or six miles upstream. The dam and sediment wedge remained intact until the 1993 flood. Several Appellants attested that prior floods in 1978 and 1980, one of which set a record for peak water flow, caused little or no damage to their farms.

¶ 4 Property owners upstream, however, had experienced flooding problems. In response, FCD embarked on two flood control projects. In 1979, FCD cleared vegetation from a 1000–foot–wide corridor running from 91st Avenue to the dam in order to improve channel flow and thus prevent high flows of water from being forced onto adjacent farmland. In 1986, FCD began constructing a "pilot channel" upstream from the dam. The channel, which was intended to straighten and direct water flow in that portion of the river, averaged three feet deep, fifty to one hundred feet wide, and extended over twenty-two miles. FCD completed both projects in 1992.

---

1. Maricopa County and Bookman–Edmonston Engineering, Inc. were dismissed from this lawsuit.

2. Collectively "Appellees."

¶ 5 In early 1993, the Gila watershed experienced record rainfall. Flooding occurred from January 1 through April 28, 1993, setting records for runoff volume and duration of flooding. On January 9, 1993, the river reached a high peak flow between 7:00 a.m. and 11:00 a.m., which was the longest duration peak flow in the river's recorded history. Several hours later, the dam incurred an initial break approximately twenty to twenty-five feet wide, which ultimately widened to 206 feet. The water rushed through the breach, creating a headcut, or trench, in the sediment wedge. This headcutting process continued for several months thereafter and extended for several miles upstream. Appellants' experts estimated that thirty-six million cubic yards of additional sediment were introduced into the river by the dam's breach and the ensuing erosion of the sediment wedge.

¶ 6 Appellants brought suit against Appellees, alleging that Appellees' conduct relating to the breach of the dam and the clearing and pilot projects caused the release of this additional sediment, which clogged the channel, caused more water to overflow the banks, and thus caused increased damage to Appellants' properties. Appellants also alleged that the sediment deposits increased the risk of damage to their properties from future flooding. Appellants based their claims on theories of negligence, strict liability, trespass, nuisance, and in the case of Maricopa County and FCD, inverse eminent domain.

¶ 7 At an October 24, 1996 scheduling conference, the trial court ordered Appellees to file their motions for summary judgment on the limited issue of damages. The court defined the issue to be addressed as "any increase in damage to the Plaintiffs caused by the failure of Gillespie Dam, as opposed to the damage caused by the flood."

¶ 8 In these motions, Appellees contended that Appellants suffered no damage due to the breach and that the alleged damage was due to Appellants' encroachment on the river's floodplain and the "extensive and sus-

tained natural flooding." Appellees relied upon the opinions of at least ten experts in preparing their motions and supporting statements of facts.

¶ 9 In their opposition to Appellees' summary judgment motions, Appellants presented the affidavits of two experts. The experts stated that the pilot and clearing projects and the breach of the dam caused millions of additional cubic yards of sediment to be washed downstream and deposited in the channel and on the riverbanks and that these deposits increased the damage to Appellants' properties and increased the risk of damage from future flooding. Following Appellees' reply, the trial court issued the following ruling:

There is controversy between the experts on certain points, which if the matter is tried, must be resolved by the jury. However, taking the Plaintiffs['] evidence, the facts which a jury could find are:

1. After the breach of the dam 36,000,-000 more cubic [yards] [3] of silt and sediment flowed down river.

2. Some undetermined amount of that silt and sediment was deposited in the river bed and on the Plaintiffs' properties. The remainder was deposited in the Painted Rock Reservoir.

3. As a result of that increased deposit, the Plaintiffs' properties are at some greater risk for flooding in the future.

A jury could not find from the evidence that the breach of the dam increased the erosion to the Plaintiffs' properties during the floods; nor that the breach increased the loss of various fixtures, fencing, wells or berms.

. . . .

To prevail at trial there must be evidence, not only of an increased risk of flooding, but there must be something upon which the jury could determine which portion of the increased risk of flooding is as a result of the flooding alone and which portion is as a result of the increased deposits of silt and sediment. Further, as

---

3. Although the trial court's minute entry stated cubic "feet," this unit of measurement was not used in any of the sediment calculations con-

tained in the record. We therefore presume the trial court meant cubic "yards."

to each Plaintiff, the jury would have to be able to determine how each was damaged by the increased risk of flooding caused by the Defendants. *Schlec[h]t v. Schiel,* 76 Ariz. 214[,] 262 P.2d 252 (1953)[.]

The evidence, as presented by the Plaintiffs, upon which the jury could consider how much the possibility of flooding has increased as a result of the silt and sediment deposits as to all of the Plaintiffs; and how any individual Plaintiff has been damaged, is insufficient to meet the standards of *Orme School* . . . .

The trial court then granted Appellees' motions for summary judgment.

¶ 10 Appellants subsequently filed a motion for new trial. In this motion, Appellants argued that the *Schlecht* case had long been superseded by the development of the "single injury" rule of *Holtz v. Holder,* 101 Ariz. 247, 251, 418 P.2d 584, 588 (1966), and that under this rule, defendants, not plaintiffs, bear the burden of proving what portion of the harm was caused by their conduct. Appellants further argued that on the "any increase in damage" issue, the trial court's findings that Appellants suffered "some" damage was enough to defeat Appellees' summary judgment motions.

¶ 11 In an April 2, 1999 minute entry, the trial court restated the summary judgment issue: "Was there 'any increase in damages to plaintiffs caused by the failure of Gillespie Dam as opposed to the damage caused by the flood[?]' " The court noted that the issue was

consistent with the holding of *Holtz v. Holder.* . . . [H]owever, the plaintiffs still must demonstrate that the defendants' actions or inaction contributed to their damage, that is that the injury was increased by the defendants' action or inaction. . . . [O]nly then, does the burden shift to the defendants to prove who bears what responsibility.

Here all of the damages before and after the breach of the dam were of the same type, the plaintiff's mission was to show that by the breach in the dam, the harm to the plaintiffs was increased. The Court's review of this matter does not persuade

the Court that the plaintiffs have carried that burden.

The trial court denied Appellants' new trial motion.

**II.**

¶ 12 In an appeal from summary judgment, we "determine *de novo* whether genuine issues of material fact exist and whether the trial court correctly applied the law." *Floyd v. Donahue,* 186 Ariz. 409, 411, 923 P.2d 875, 877 (1996). A motion for summary judgment "should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School,* 166 Ariz. at 309, 802 P.2d at 1008. "Where reasonable minds could reach different conclusions as to the existence of a genuine issue, summary judgment should not be granted." *Tribe v. Shell Oil Co.,* 133 Ariz. 517, 518, 652 P.2d 1040, 1041 (1982).

¶ 13 The trial court defined the issue on summary judgment as "any increase in damages" beyond that caused by the flood itself. Thus, if Appellants would have suffered the same damages in the absence of Appellees' allegedly negligent acts, Appellees obviously would not be liable. *See Markiewicz v. Salt River Valley Water Users' Ass'n,* 118 Ariz. 329, 338, 576 P.2d 517, 526 (1978) (citing Restatement (Second) of Torts, § 432(1), illus. 2 (1965)). But if Appellees' allegedly negligent acts were a cause of "some part" of Appellants' damages, Appellees would be liable for at least the damages they caused. *Id.*

¶ 14 In *Markiewicz,* a group of homeowners sued Salt River Valley Water Users' Association after their homes were damaged by water escaping from the Arizona Canal during a severe rainstorm. *Id.* at 332–33, 576 P.2d at 520–21. The homeowners observed a wall of water rush through the area around the same time the canal's bank eroded and washed out. *See id.* at 333, 339, 576 P.2d at 521, 527. The Association argued that the storm was so severe and caused so much water to enter the canal, the canal would have overflowed in any event and that damages were caused by an overtopping of

the canal and did not result from the escape of water through certain breaches as the homeowners maintained. *See id.* at 338, 576 P.2d at 526. At the close of evidence, the trial court granted a directed verdict in favor of the Association. *See id.* at 333, 576 P.2d at 521. On appeal, this court acknowledged that the water overtopping the canal could have caused part of the damages; however, it concluded that "a jury could find that the flood waters escaping the canal [through the breaches] possessed greater volume and greater kinetic force than they would have had absent the Association's negligence, and that this contributed to appellants' injuries." *Id.* at 339, 576 P.2d at 527.

¶ 15 In *Taft v. Ball, Ball & Brosamer, Inc.,* 169 Ariz. 173, 174, 818 P.2d 158, 159 (1991), a construction company was building "Reach 1B" of the Central Arizona Project canal when heavy rainfall caused the incomplete canal to overflow, flooding the plaintiffs' properties. The issue presented was whether the plaintiffs could show that the construction increased the flood damages beyond what would have occurred naturally. After citing the standard set forth in *Markiewicz,* this court reasoned as follows:

> [T]he experts agreed that appellants' land would have been flooded to some extent absent any construction on Reach 1B. It is also conceded that appellants have not shown a specific dollar amount of damage sustained over and above that which they would have received, absent the Reach 1B construction activity. But appellants have shown that they received a greater amount of water and a greater flow rate of water than they would have received absent the construction. An expert testified that "more water usually means more damage," and that "generally the flood damage curve ... goes up with increased discharge."
>
> As in *Markiewicz,* a jury could conclude that more water flowing at a greater rate contributed to appellants' damages. Therefore, in our opinion, there is sufficient evidence of causation in the record to preclude summary judgment on causation.

*Taft,* 169 Ariz. at 177–78, 818 P.2d at 162–63. Hence, under *Markiewicz* and *Taft,* to defeat a motion for summary judgment, a plaintiff must produce evidence that the defendant caused "some part" of the plaintiff's damages, which need not be quantified or apportioned. *Markiewicz,* 118 Ariz. at 338, 576 P.2d at 526; *Taft,* 169 Ariz. at 177, 818 P.2d at 162. The record here reveals that Appellants met this test.

¶ 16 In response to the motions for summary judgment, Appellants submitted the affidavit testimony of Dr. Daryl B. Simons. Dr. Simons holds a Ph.D. degree in hydraulics and river mechanics from Colorado State University and is a registered professional engineer in Arizona and several other states. He has served as an Associate Dean of the Colorado State University College of Engineering and has written several textbooks on sediment transport technology and fluid mechanics. Dr. Simons explained that FCD's pilot channel project increased the average gradient of the river channel above the dam. The clearing project removed vegetation that previously had held sediment in place and slowed water flow in that stretch of the river. He stated that both of these projects increased water velocity during the 1993 flood, which caused the river to pick up and carry downstream substantially more sediment than would have been carried by the natural channel.

¶ 17 Dr. Simons explained that when the dam broke, the water poured through the breach, which increased the water's ability to carry more silt and sediment from the upstream portions of the river through the breach and into the river's lower reach. The high-velocity water created a headcut in the sediment wedge, and forty-one million cubic yards of sediment were released from the river bed above the dam and carried to the area between the dam and Painted Rock Reservoir. Much of that sediment was deposited in and along Appellants' properties. Dr. Simons attested that had the dam not breached, computer analysis demonstrated that only five million cubic yards of silt and sediment would have passed over the dam. The breach thus caused an additional thirty-six million cubic yards of sediment to be deposited in the lower reach of the river, according to Dr. Simons.

¶ 18 Dr. Simons further explained that the great volume of sediment created new sandbars and islands, obstructed the channel, and changed the direction of the floodwater flows. Water that otherwise would have flowed in the channel was diverted onto farmlands, increasing erosion, crop loss, and loss of wells, ditches, and other fixtures. Dr. Simons attested that the sediment reduces the river's ability to carry future floodwaters and thus increases the risk of property damage from future floods.

¶ 19 Appellants also submitted the affidavit of Dr. William L. Graf. Dr. Graf holds a Ph.D. in physical geography and water resources management from the University of Wisconsin. Currently a professor at Arizona State University, he specializes in fluvial geomorphology, hydrology, and aerial photograph interpretation. Rather than calculating the amount of sediment deposited on Appellants' land as Dr. Simons had done, Dr. Graf based his opinions on personal observations of the riverbed before and after the flood, on the testing of soil samples, and on analysis of aerial photographs. Dr. Graf observed that the once-open river channel had been covered by significant quantities of sediment. He observed significant erosion of the banks and perimeter of the channel caused by water that normally would have occupied the channel but for the sediment that now filled it. Dr. Graf's soil analysis confirmed that much of this sediment filling the channel came from the upstream portion of the dam. Dr. Graf concurred with Dr. Simons' opinion that the FCD's pilot and clearing projects and the breach of the dam caused substantial amounts of sediment to be deposited in the river channel adjacent to Appellants' properties, directly contributing to Appellants' damage. We conclude that the opinions proffered by Dr. Simons and Dr. Graf created a *prima facie* case for Appellants.

¶ 20 Appellees' experts reached different, and often *conflicting, conclusions.* Appellees offered expert evidence that 104 million cubic yards of sediment were transported over the crest or through the breach of the dam between January 1 and April 28, 1993. Of this amount, twelve million cubic yards of sediment, or thirteen percent, resulted from the breach. Appellees maintain that of the twelve million cubic yards, half of this amount, or six million cubic yards, were carried directly to Painted Rock Reservoir, leaving "approximately 6,000,000 cubic yards of sediment that *could* have caused injury to [Appellants'] property."

¶ 21 In their brief, Appellees attempt to impugn Appellants' experts. Appellees suggest that the trial court found that Dr. Simons and Dr. Graf failed to utilize "accepted scientific methodologies or techniques." Appellees argue that none of Appellants' experts "studied, measured, or calculated any specific injury to [Appellants'] property that resulted from the [Appellees'] conduct"; therefore, evidence of causation was insufficient. Appellees point to Dr. Simons' deposition testimony stating that he had "looked at the general problem of excess sediments" and where they were deposited, but had conducted "no studies to identify impacts on personal properties." Appellees also cite Dr. Graf's deposition testimony stating that he had "not been asked to investigate individual properties or sites along the river channel."

¶ 22 First, contrary to Appellees' assertion, the record contains no finding by the trial court, either explicit or implied, that Appellants' experts failed to utilize accepted scientific methods. Next, under *Markiewicz* and *Taft,* Appellants were not required to show individualized damages. *See Markiewicz,* 118 Ariz. at 338–39, 576 P.2d at 526–27; *Taft,* 169 Ariz. at 177–78, 818 P.2d at 162–63. Here, Dr. Simons testified in his affidavit that of the estimated forty-one million cubic yards of silt and sediment that flowed over and through the dam, approximately thirty-six million cubic yards resulted from the dam's breach and that much of that sediment was deposited in and along Appellants' properties, creating sandbars and filling the river's channel. Like the plaintiffs in *Markiewicz* and *Taft,* who showed that they received a greater amount and flow rate of water than they would have received absent the defendants' negligent conduct, Appellants presented evidence that a greater amount of sediment was lifted from the sediment wedge due to the increased velocity of the water,

carried through the breach, and deposited on or near their properties than would have been carried over the dam and deposited absent the breach and the pilot and clearing projects. This evidence creates a genuine issue of fact regarding whether the increased volume of sediment contributed to Appellants' damages. *See Markiewicz,* 118 Ariz. at 339, 576 P.2d at 527; *Taft,* 169 Ariz. at 178, 818 P.2d at 163. Because the record supports an inference that Appellees' conduct contributed to Appellants' damages, we reverse the trial court's grant of summary judgment to Appellees.

¶ 23 Furthermore, we agree with Appellants that in a case such as this, where multiple tortfeasors cause indivisible damage, the *Schlecht* case has long been superseded by the single injury rule of *Holtz* and its progeny. In *Schlecht,* the plaintiff suffered damage after the defendant constructed a wall in a wash that diverted stream water onto the plaintiff's property during a rainstorm. 76 Ariz. at 217, 262 P.2d at 254. The supreme court approved a jury instruction that stated that it was "not sufficient" for a plaintiff to show that a defendant caused some damage, but that the plaintiff must show "how much of the damage" was caused by the defendant or encounter a defense verdict. *Id.* at 219–20, 262 P.2d at 255. Later, in *Holtz,* the supreme court adopted the "single injury" rule where a plaintiff suffered indivisible injury from separate accidents. 101 Ariz. at 248, 251, 418 P.2d at 585, 588. There, the court shifted the burden of apportionment to the defendants, noting that "it is more desirable, as a matter of policy, for an injured and innocent plaintiff to recover his entire damages jointly and severally from independent tortfeasors … than it is to let two or more wrongdoers escape liability altogether, simply because the plaintiff cannot carry the impossible burden of proving the respective shares of causation." *Id.* at 251, 418 P.2d at 588.

¶ 24 Recently, in *Piner v. Superior Court,* 192 Ariz. 182, 962 P.2d 909 (1998), the supreme court considered the status of the single injury rule in light of the legislature's abolition of joint and several liability. The court held that "the present version of UCA-TA has left intact the rule of indivisible injury, relieving the plaintiff of apportioning damage according to causal contribution." *Id.* at 188, ¶ 26, 962 P.2d at 915. The court noted that this rule applies to both multiple causation and successive injury cases: "Like our predecessors in *Holtz,* we see no reason to employ a different rule if the injuries occur at once, five minutes apart or, as in the present case, several hours apart. The operative fact is simply that the conduct of each defendant was a cause and the result is indivisible damage." *Id.* at 189, ¶ 27, 962 P.2d at 916.

¶ 25 Thus, once a plaintiff proves that the defendants' conduct contributed to the plaintiff's damages, *see Markiewicz,* 118 Ariz. at 338, 576 P.2d at 526, the burden of proof shifts to the defendants to apportion damages. *See Piner,* 192 Ariz. at 189, ¶¶ 28, 30, 962 P.2d at 916; *Holtz,* 101 Ariz. at 251, 418 P.2d at 588.

¶ 26 Appellees also argue that Appellants cannot recover damages for any of their properties that are located within the ordinary high water mark of the Gila River. Appellees contend that under 33 U.S.C. §§ 1342 and 1344, use of real property lying within this area is allowed only after obtaining permits from the Army Corps of Engineers and that Appellants "admitted" that they did not possess these permits. Appellees provide no authority to support their contention that these statutes, which address the "discharge of pollutants" and "dredged or fill material" into navigable waterways, apply to Appellants. We therefore decline to consider it. *See* ARCAP 13(b)(1); *Ness v. Western Sec. Life Ins. Co.,* 174 Ariz. 497, 503, 851 P.2d 122, 128 (1992).

¶ 27 Because of our resolution of the summary judgment issue, the issue raised by Appellants regarding Appellees' purported "Act of God" defense is moot. We therefore do not address it.

### III.

¶ 28 The record reveals that Appellants presented ample, well-founded expert evidence from which a jury could conclude that the pilot and clearing projects and the breach of Gillespie Dam increased the damage to

their properties beyond that due to the natural flood itself. This evidence satisfies the requirements of *Markiewicz* and *Taft,* and it creates a genuine issue of fact regarding whether Appellees caused any increase in Appellants' damages. Accordingly, we reverse the trial court's grant of summary judgment to Appellees and remand the case for further proceedings.

CONCURRING: PHILIP E. TOCI, Presiding Judge, and RUDOLPH J. GERBER, Judge.