204 P.3d 1051

A TUMBLING–T RANCHES, an Arizona general partnership; Russell Badley Farms, Inc., an Arizona corporation; Rosemary L. Edwards, individually and as Trustee of the Rosemary L. Edwards Trust; John E. Fornes, Jr., and Shelley Fornes, husband and wife; PJ Farms Limited Partnership, an Arizona limited partnership; J & A Fornes, II, an Arizona general partnership; Delmar John and Jean John, husband and wife d/b/a Delmar John Farms; Gila River Farms, Inc., an Arizona corporation; Roy Pierpoint and Ella Pierpoint, husband and wife; Pierpoint Farms, Inc., an Arizona corporation; and Wood Brothers Farms, an Arizona general partnership, Plaintiffs/Appellees,

v.

FLOOD CONTROL DISTRICT OF MARICOPA COUNTY, a body politic, Defendant/Appellant.

No. 1 CA–CV 07–0760.

Court of Appeals of Arizona, Division 1, Department A.

Nov. 28, 2008.

Review Denied March 17, 2009.

Haralson, Miller, Pitt, Feldman & McAnally, P.L.C. By Thomas G. Cotter, Tucson, Stanley G. Feldman and Kinerk, Beal, Schmidt, Dyer & Sethi, P.C. By Burton J. Kinerk, Tucson, Attorneys for Plaintiffs/Appellees.

Law Offices of Reed King By Reed W. King, Phoenix, Co–Counsel for Plaintiffs/Appellees.

Swenson, Storer, Andrews, Frazelle & Sayre, P.C. By Michael J. Frazelle, Phoenix, Attorneys for Defendant/Appellant.

## OPINION

BARKER, Judge.

¶ 1 The principal question presented to us in this matter is whether a *Damron/Morris* agreement [1] may be entered into based on an

---

1. *See Himes v. Safeway Ins. Co.*, 205 Ariz. 31, 34 n. 2, ¶ 1, 66 P.3d 74, 77 n. 2 (App.2003) ("Throughout this opinion we utilize the term *'Damron/Morris'* agreement, *e.g. Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969) and *United Servs. Auto Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987), to refer to any agreement between a third-party claimant and insured whereby the insured consents in any fashion to liability and enters into an agreement providing the third-party claimant with the insured's breach of contract and bad faith claims against

indemnity and hold-harmless agreement contained within a property easement as contrasted with an insurance contract. For the reasons that follow, we hold that it may, but that the liability of the indemnitor for amounts found to be reasonable will depend on the construction of the indemnity agreement at issue.

## I.

### A.

¶ 2 This case involves damages alleged from the failure of the Gillespie Dam on January 9, 1993. The Gillespie Dam is located on the Gila River, halfway between Buckeye and Gila Bend, Arizona, some sixty miles southwest of Phoenix. This litigation has been on-going for thirteen years. We previously considered aspects of this case eight years ago. *See A Tumbling–T Ranches v. Paloma Inv. Ltd. P'ship,* 197 Ariz. 545, 5 P.3d 259 (App.2000). In addition to this appeal, there is another aspect of this matter presently on appeal, *A Tumbling–T Ranches v. Flood Control District of Maricopa County,* 1 CA–CV 07–0453 (Ariz.App. filed July 5, 2007), and a separate indemnity action still pending in the superior court, *Flood Control District of Maricopa County v. Paloma Investment Limited Partnership,* CV 1997–007081 (Maricopa County Super. Ct. filed Apr. 17, 1997). Because of the extended factual and legal background with regard to this proceeding, we limit ourselves to that which is necessary to the issue presented to us. Nonetheless, some discussion of the overall proceeding is required so that the pending issues can be put in their proper context.

### B.

¶ 3 Appellant Flood Control District of Maricopa County ("District") appeals both from (1) the trial court's findings concerning the reasonableness of a settlement agreement entered into between the Appellees (referred to collectively by the parties as "the Farmers") and various parties (referred to collectively as "the Dam Owners")[2] and (2) the fact that the trial court permitted the procedure. By way of background, in 1982, the Dam Owners gave the District an easement to establish a channel in portions of the Gila River, upstream from the Gillespie Dam. The easement contained an indemnity agreement whereby the District agreed to indemnify and hold the Dam Owners harmless from certain liabilities. After the Gillespie Dam failed on January 9, 1993, the Farmers filed a complaint against the Dam Owners on January 1, 1995, claiming damages to their properties, which were adjacent to, or near, the Gila River. These claims were based upon negligence, strict liability, trespass, and nuisance, arising out of the maintenance, ownership, and control of the dam. The Farmers also named the District in their 1995 lawsuit and alleged that the upstream clearing and piloted channel project, which had been the subject of the easement, also caused them damages.

¶ 4 On March 5, 1997, the Farmers' 1995 lawsuit against the Dam Owners was consolidated with another 1995 case that arose out of the same facts and circumstances.[3] The following month, the Dam Owners filed an indemnity action against the District, based upon the indemnity clause contained in the easement. Though not the subject of this appeal, portions of the 1997 indemnity case were tried to the court on May 8, 2000. The

---

the insurer in exchange for a covenant not to execute against the insured.... By merely choosing to use the term *'Damron/Morris'* agreement, we do not intend to influence the circumstances under which an insurer has the right to be heard on the reasonableness of a settlement amount or damages figure.... There are *Damron/Morris* agreements under which an insurer has no right to contest damages on the basis of reasonableness, but only on the basis of fraud or collusion. *E.g., Damron,* 105 Ariz. 151, 460 P.2d 997. Our opinion is not directed to those agreements.").

2. Those designated as the Dam Owners in the settlement agreement are "Paloma Investment Limited Partnership, a limited partnership, Prudential Insurance Company of America, a New Jersey corporation, and Paloma Ranch Joint Venture, a joint venture (collectively 'Dam Owners') (which term includes their insurers The Hartford Insurance Company and Travelers Insurance Company)."

3. *Indus. Risk Insurers v. Paloma Inv. Ltd. P'ship.,* CV1995–000290 (Maricopa County Super. Ct. filed Jan. 6, 1995).

trial court determined that the language of the indemnity clause was broad enough to cover all fault of the District, unless it was based on intentional acts of the Dam Owners.

¶ 5 The 1995 consolidated cases were subsequently consolidated with the 1997 indemnity action filed by the District. The consolidated cases were then bifurcated into a liability and a damages phase. The liability phase was tried to a jury based on theories of inverse eminent domain and negligence. The jury found in favor of the District on the inverse eminent domain claim. However, on the negligence claim, the jury made a fault determination of 80% attributable to the Dam Owners, 10% to the District, and 10% to non-parties.

¶ 6 On September 18, 1996, and January 4, 2005, the Dam Owners tendered the defense of this matter to the District, which tenders the District declined. After the liability phase but before the damages phase, the Dam Owners entered into a settlement agreement with the Farmers. The agreement stated that a stipulated judgment would be entered in favor of the Farmers and against the Dam Owners in the amount of $14.75 million. The stipulated judgment also provided that the Dam Owners would pay the Farmers approximately $3.3 million in return for a covenant not to execute against the Dam Owners on the remainder of the judgment. The judgment expressly provided that the Farmers were not releasing the Dam Owners from liability even though the Farmers agreed (as set forth in the covenant not to execute) they would take no steps against the Dam Owners to collect on the judgment.

¶ 7 The Farmers requested a reasonableness hearing on the settlement agreement. Over the District's objection, the trial court granted the hearing. It took place on March 30, 2007. After the hearing, the trial court ruled that $14.75 million was a reasonable settlement, that "the Agreement was not the product of bad faith, fraud, or collusion," and that the indemnity claim against the District was not limited to the $3.3 million actually paid by the Dam Owners. The District timely appealed. We have jurisdiction pursuant

to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

**II.**

¶ 8 The District makes several arguments on appeal: (1) that the trial court erred in conducting a reasonableness hearing, (2) that the trial court erred in determining that the indemnity claim is not restricted to the amount actually paid by the Dam Owners, (3) that the trial court erred in determining that the October 11, 2006 settlement was free of fraud or collusion, and (4) that the trial court erred in determining that the settlement amount was reasonable. A fundamental contention running throughout the District's arguments is that the principles underlying *Damron/Morris* agreements are restricted to insurance settings and thus inapplicable here. We address that contention first before turning to the District's specific arguments.

**III.**

¶ 9 The District contends that the "reasonableness hearing procedure [permitted with a *Damron/Morris* agreement] is inapplicable to this case as this matter does not involve any attempts to require a liability insurer for any settling defendant to pay a stipulated judgment on the basis of a failure to cover a claim." The District argues that "[t]he Farmers and the Dam Owners have improperly attempted to engraft insurance bad faith principles onto a commercial transaction involving an indemnity clause which exists outside of the special relationship created by a liability insurance transaction." The District has confused the basis for a *Damron/Morris* agreement with the basis for an insurance bad faith claim.

¶ 10 An insurance bad faith claim is based upon the breach of a duty owed to an insured by the insurer. *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981) ("We have determined that … there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort.") The breach of such a duty gives rise to an insurance bad faith

claim and tort damages based upon the special relationship that exists between an insurer and an insured. *Rawlings v. Apodaca,* 151 Ariz. 149, 163, 726 P.2d 565, 579 (1986) ("[B]ecause of the special relationship between an insurer and its insured, the insured may maintain an action to recover tort damages . . . .").

¶ 11 A *Damron/Morris* agreement, however, is based upon general principles of indemnity law. The Arizona Supreme Court made this plain in *United Servs. Auto. Ass'n v. Morris,* 154 Ariz. 113, 120, 741 P.2d 246, 253 (1987). When referring to whether a judgment entered pursuant to such an agreement would be binding on the insurer, the Arizona Supreme Court based its decision on "general principles of indemnification law" and held:

> An indemnitor is bound by the settlement made by its indemnitee if, but only if, the indemnitor was given notice and opportunity to defend. . . . [T]he indemnitor will be liable to the indemnitee to the extent that the indemnitee establishes that the settlement was reasonable and prudent under all the circumstances.

*Id.* (citations omitted). This statement is essentially a paraphrase of Restatement (Second) of Judgments § 57(1) (1982), applicable to indemnitors generally, which provides as follows:

> (1) Except as stated in Subsection (2), when one person (the indemnitor) has an obligation to indemnify another (the indemnitee) for a liability of the indemnitee to a third person, and an action is brought by the injured person against the indemnitee and the indemnitor is given reasonable notice of the action and an opportunity to assume or participate in its defense, a judgment for the injured person has the following effects on the indemnitor in a subsequent action by the indemnitee for indemnification: (a) The indemnitor is estopped from disputing the existence and extent of the indemnitee's liability to the injured person; and (b) The indemnitor is precluded from relitigating issues determined in the action against the indemnitee if: (i) the indemnitor defended the action against the indemnitee; or (ii) the indem-

nitee defended the action with due diligence and reasonable prudence.

Restatement (Second) of Judgments § 57(1) (1982).

¶ 12 We can appreciate that the District considers the special relationship between an insurer and an insured to create separate duties not applicable to a commercial indemnity agreement in a non-insurance setting. It does. *See, e.g., Rawlings,* 151 Ariz. at 159, 726 P.2d at 575 ("When dealing with an innkeeper, a common carrier, a lawyer, a doctor or an insurer, the client/customer seeks service, security, peace of mind, protection or some other intangible. These types of contracts create special, partly noncommercial relationships, and when the provider of the service fails to provide the very item which was the implicit objective of the making of the contract, then contract damages are seldom adequate, and the cases have generally permitted the plaintiff to maintain an action in tort as well as in contract."). One of those duties unique to an insurance bad faith claim, however, is *not* the ability under indemnity law to potentially bind an indemnitor. Section 57(1) provides generally that when "a liability" is covered under the terms of an indemnity agreement, the indemnitor may be bound by a judgment, after notice and an opportunity to defend if "the indemnitee defended the action with due diligence and reasonable prudence." In a case with some similarities to the one at hand, *Cunningham v. Goettl Air Conditioning, Inc.,* the Arizona Supreme Court applied these principles and expressly recognized § 57(1). 194 Ariz. 236, 240, ¶ 19, 980 P.2d 489, 493 (1999).

¶ 13 In *Cunningham,* there was an indemnity clause in a lease agreement. *Id.* at 237, ¶ 1, 980 P.2d at 490. The clause required Goettl, the tenant, to indemnify and hold harmless WSI, the landlord. *Id.* WSI was sued in tort following an injury on the property. *Id.* WSI tendered the defense to Goettl, which tender was declined. *Id.* at 237–38, ¶ 3, 980 P.2d at 490–91. WSI and the tort claimant then entered into a stipulated judgment with a covenant not to execute against WSI. *Id.* at 238, ¶ 5, 980 P.2d at 491.

¶ 14 In determining the validity of the agreement, the court set forth that "[b]ecause section 57 of the Restatement directly addresses the issue before us, we look to the Restatement to determine the effect on Goettl of the judgment against WSI, its indemnitee." *Id.* at 239, ¶ 14, 980 P.2d at 492. As that section holds, if the indemnitor was "given reasonable notice of the action and an opportunity to assume or participate in its defense," it is then "estopped from disputing the existence and extent of the indemnitee's liability to the injured person." Restatement (Second) of Judgments § 57(1). When the indemnitee defends the action "with due diligence and reasonable prudence," the indemnitor is "precluded from relitigating issues determined in the action against the indemnitee." *Id.*

¶ 15 Applying the standard from § 57(1) to the facts of this case, we determine that the trial court did not abuse its discretion in holding a reasonableness hearing and finding the settlement to be reasonable. We discern no fundamental difference between the obligations imposed under § 57(1) and those set forth in the *Damron/Morris* line of cases. Thus, we reject the contention that there was no ability to enter into a *Damron/Morris* agreement in a context other than an insurance case. We emphasize, however, that this holding does not determine whether indemnification for the judgment so entered will be required. As *Cunningham* makes clear, "[t]he *language of the [ ] indemnity agreement*, not the consent judgment, determines the extent of Goettl's liability to its indemnitee." 194 Ariz. at 242, ¶ 27, 980 P.2d at 495 (emphasis added). This, too, is similar to the situation in an insurance setting. *Morris*, 154 Ariz. at 120, 741 P.2d at 253.

¶ 16 In *Morris,* there was a bright line drawn between the tort case and the coverage case. *Id.* Equating the indemnity case here with the coverage case in *Morris,* the following principle from *Morris* applies: "[D]espite the insured's settlement stipulations, the coverage issue [indemnity issue] is clearly unresolved and [the indemnitor] may litigate it on remand." *Id.* at 120, 741 P.2d at 253. Reading *Morris* with an eye to an indemnity clause, as contrasted with an insurance agreement, leads to the following result: "An insured's [an indemnitee's] settlement agreement should not be used to obtain coverage [indemnification] that the insured [indemnitee] did not purchase [contract for]." *Id.* Further, "[i]f the insurer [indemnitor] wins on the coverage [indemnity] issue, it is not liable for any part of the settlement." *Id.* at 121, 741 P.2d at 254.

¶ 17 Based on the foregoing, we reject the District's fundamental argument that a *Damron/Morris* agreement may be enforced only in an insurance case. We acknowledge, however, that any liability under such agreements will turn on the language of the indemnity agreement. We now turn to the specific arguments made by the District.

## IV.

¶ 18 The District first argues that the trial court erred in holding a reasonableness hearing. The District argues that this is so because such a hearing held no purpose, since "any determination of the reasonableness or unreasonableness of th[e] settlement can have no legal effect on the District's ultimate indemnity liability." We disagree.

¶ 19 As set forth above, whether following a paradigm set forth under *Morris* or one under § 57(1), the party seeking to bind the indemnitor must show that the "settlement was reasonable and prudent under all the circumstances," *Morris,* 154 Ariz. at 120, 741 P.2d at 253, or "the indemnitee defended the action with due diligence and reasonable prudence," Restatement (Second) of Judgments § 57(1). The District argues that this determination should have taken place in the indemnity proceeding rather than in the tort case. The District does not complain, however, that it was inhibited in any fashion in presenting any and all evidence it desired on the issue of reasonableness of the settlement. There is no assertion that a jury trial was requested and denied or that there were limitations placed upon it in terms of witnesses, exhibits, or arguments. Indeed, the same judge who presided over the reasonableness hearing in the tort case was presiding, at that time, over the indemnity matter.

¶ 20 In its conclusions of law, the trial judge specifically referred to § 57(1). It is clear that the trial court was following those requirements. Thus, absent some showing on appeal that the procedure applied in the tort case was in some fashion different than what would have been provided in the indemnity case, we find no error. *See Waddell v. Titan Ins. Co.*, 207 Ariz. 529, 535, ¶ 23, 88 P.3d 1141, 1147 (App.2004) (stating in an insurance setting that "it would serve the purpose of judicial economy to permit the insurer to take this opportunity when all of the parties are involved and can present evidence to the court on the issue at one hearing") (emphasis omitted) (quoting *Anderson v. Martinez*, 158 Ariz. 358, 363, 762 P.2d 645, 650 (App.1988)).

## V.

¶ 21 As noted earlier, the stipulated judgment in this case was for $14.75 million, but the Farmers signed a covenant not to execute on the judgment as to the Dam Owners in exchange for a direct payment of $3.3 million from them. The District denies that it is liable under the indemnity agreement for any of the claimed damages represented by the judgment. However, it alternatively argues that the cap on its liability under the indemnity provision is the amount actually paid ($3.3 million) and not the amounts to which the covenant not to execute applies (the remaining $11.45 million). As part of our analysis of this issue we must address the difference between a covenant not to execute and a release.

¶ 22 In Arizona a covenant not to execute is not a release from liability.[4] A covenant not to execute " 'does not extinguish the plaintiff's cause of action,' " whereas a release "abandons 'a claim or right to the person against whom the claim exists or the right is to be enforced or exercised.' " *Cunningham*, 194 Ariz. at 241, 242, ¶ 25, 980 P.2d

at 494, 495 (quoting *Rager v. Superior Coach Sales & Serv.*, 110 Ariz. 188, 191, 516 P.2d 324, 327 (1973), and 66 Am.Jur.2d *Release* § 1, at 678 (1973)). This difference between a release and a covenant not to execute is not limited to, or a byproduct of, the special relationship between an insurer and an insured. *Monthofer Invs. Ltd. P'ship v. Allen*, 189 Ariz. 422, 426, 943 P.2d 782, 786 (App. 1997) ("[O]ur courts have held, in contexts other than disputes between insurers and insureds, that covenants not to sue or not to execute are contracts, *not releases*.") (emphasis added).

¶ 23 Thus, to the extent the District is claiming that a covenant not to execute is essentially a release and, as a matter of law, we must cap the potential liability under the indemnity clause at what was actually paid, we reject the argument. Again, however, we do not have before us, *supra* ¶ 4, and consequently, do not rule on, whether the type of "liability" contemplated under the indemnity agreement entered between the parties includes liability for amounts that are not required to be paid. As indicated earlier, *Cunningham* is quite clear in its mandate that *"the language of the [ ] indemnity agreement,* not the consent judgment, determines the extent of [the indemnitor's] liability to its indemnitee." 194 Ariz. at 242, ¶ 27, 980 P.2d at 495 (emphasis added). Contracts are to be construed to give words their ordinary, common sense meaning. *Chandler Med. Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (App. 1993) ("The controlling rule of contract interpretation requires that the ordinary meaning of language be given to words where circumstances do not show a different meaning is applicable."). Most reasonable people either may not agree, or would at least be in doubt, as to whether the contractual term "liability" in an arm's-length agreement was intended to include amounts which the parties ex-

---

4. At least one jurisdiction has held that covenants not to execute eliminate all obligations of an indemnitor and that the obligation of an indemnitor is limited to amounts actually paid by the indemnitee in those situations. *See, e.g., City of Columbus v. Alden E. Stilson & Assocs.*, 90 Ohio App.3d 608, 630 N.E.2d 59, 65 (1993) (finding that a settlement made contingent upon a covenant not to execute was "such a contrived liability against the indemnitor as to be against public policy, as an attempt to expand the indemnitor's obligation to pay 'any judgment' beyond what reasonably could have been the understanding of the parties as to the definition of a judgment against the city arising from [the indemnitor's] performance under the contract").

pressly agreed there was no obligation to pay. *See* Merriam–Webster's Collegiate Dictionary 668 (10th ed. 2001) ("LIABLE implies a *possibility or probability of incurring something* because of position, nature, or particular situation. ...") (emphasis added); The American Heritage Dictionary of the English Language (4th ed.2006), *available at* http://dictionary.reference.com/browse/liable (defining "liable" as "[l]egally obligated; responsible"); Compact Oxford English Dictionary (3rd ed.2005), *available at* http://www.askoxford.com/concise_oed/liable?view=uk (defining "liable" as "responsible by law; legally answerable"). These considerations are also consistent with that portion of *Cunningham* which provides that the indemnitor "must indemnify ... the amount of *actual liability* incurred by [the indemnitee]." 194 Ariz. at 242, ¶ 28, 980 P.2d at 495 (emphasis added). The same could be applied to the contractual term "hold harmless" when there is nothing to be held harmless from.

¶ 24 In this regard we note that the circumstances that result in the inability to pay may have a bearing on whether a finder of fact considers an obligation to which there is no duty to pay a "liability" within the terms of the contract at issue. For instance, a fact finder may consider an inability to pay that is involuntary (e.g., based on lack of funds or bankruptcy) to be different from a voluntary arrangement that intentionally and expressly provides that there will be no obligation on the part of the indemnitee to pay regardless of the indemnitee's ability to pay.

¶ 25 In this regard we consider this point to be somewhat different than, or in addition to, that presented in *Monthofer*. In that case, a potential indemnitor argued that any damages under a covenant not to execute were "merely a legal fiction" and could not satisfy the element of damages necessary to pursue a tort claim. *Monthofer*, 189 Ariz. at 425, 943 P.2d at 785. In rejecting that claim, the court correctly noted that the liability was no fiction, as there was a difference between a covenant not to execute and a release. *Id.* at 425–26, 943 P.2d at 785–86. The point that we accept is that, in the context of an indemnity agreement done at arm's length between parties of equal standing, it may well be that the terms "liability" or "hold harmless" were not reasonably considered by the parties to include amounts (such as those here) for which there is no obligation to pay. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993) ("When interpreting a contract, nevertheless, it is fundamental that a court attempt to 'ascertain and give effect to the intention of the parties at the time the contract was made if at all possible.'") (quoting *Polk v. Koerner*, 111 Ariz. 493, 495, 533 P.2d 660, 662 (1975)).

■ ¶ 26 We further note that as to the indemnity clause in an insurance contract, this issue is settled. The liability of an insured, when based upon a judgment with a covenant not to execute, falls within the scope of the insuring agreement if it would be covered but for the covenant not to execute. *State Farm Mut. Auto. Ins. Co. v. Paynter*, 122 Ariz. 198, 203, 593 P.2d 948, 953 (App.1979) [5]; *Globe Indem. Co. v. Blomfield*, 115 Ariz. 5, 8, 562 P.2d 1372, 1375 (App.1977).

¶ 27 We do not consider, however, that the holdings from *Paynter* and *Blomfield* resolve this issue in the setting before us: an indemnity agreement as part of the commercial contract where § 57 is at issue. As the

---

5. In *Paynter* we stated:

> State Farm argues that under the terms of the policy it is only obligated to pay a judgment which its insured is legally obligated to pay and that the covenant not to execute renders the judgment one which its insured is not legally obligated to pay. Paynter responds that by its terms the covenant is not a release from liability and that the authorities relied upon by State Farm represent the minority view of jurisdictions which disapprove Damron-type covenants.

> We agree with Paynter that were we to sustain State Farm's position in this regard we would wholly undermine the purpose of such agreements, and our holding would be inconsistent with our Supreme Court's approval of them in *Damron v. Sledge, supra*. Division Two of this Court has squarely held that the covenant not to execute is not a release which would permit the insurer to escape its obligations. *Globe Indemnity Co. v. Blomfield*, 115 Ariz. 5, 562 P.2d 1372 (App.1977). We find no reason to depart from that holding here.

> 122 Ariz. at 203, 593 P.2d at 953.

Arizona Supreme Court recognized in *Cunningham*, the scope and the applicability of *Damron/Morris* agreements in such settings is one which "[t]his court has never addressed directly." *Cunningham*, 194 Ariz. at 239, ¶ 14, 980 P.2d at 492.

¶ 28 To summarize on this point, we do not determine whether there is a question of fact as to the terms "liability" or "hold harmless" in this particular indemnity agreement that will preclude liability. The indemnity case is not before us. Our point is that this issue is not settled as to the wide variety of commercial agreements that could be drafted, and we do not (and, indeed, cannot) decide it as part of the tort/settlement case before us. For instance, there would be nothing to preclude an arm's-length indemnity clause in a non-insurance setting from expressly excluding "liabilities" (such as those representing a covenant not to execute) that the indemnitee has no obligation to pay. There may also be circumstances where either (1) the construction of the term would not include such "liabilities" and/or (2) statements or other facts concerning the indemnity clause are such that a reasonable person would conclude that liabilities (that were intentionally created with no obligation to pay) were not within the meaning of a particular indemnity clause. *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 400, 682 P.2d 388, 405 (1984) (noting that when interpreting contracts, "[o]nly those reasonable expectations which are induced by the words or conduct of the parties should be considered"). Depending on the record, these considerations would be issues for the court (or finder of fact) in determining whether the language of the indemnity agreement in this case includes the amounts at issue here.[6]

¶ 29 Thus, while we reject the District's proposition that it cannot as a matter of law be liable for amounts that the Dam Owners have no obligation to pay, it remains a potential fact question to be resolved in the indemnity case.

## VI.

▮ ¶ 30 The District next argues that the trial court erred in determining that the October 11, 2006 settlement was free of fraud or collusion. The District argues that the existence of the covenant not to execute indicates fraud or collusion. We disagree.

¶ 31 This issue was squarely addressed in *Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969). There, the assertion was made that a covenant not to execute and a subsequent assignment of the underlying judgment constituted a collusive and fraudulent contract. *Id.* at 152–53, 460 P.2d at 998–99. The court held: "It cannot be held that as a matter of law collusion exists simply because a defendant chooses not to defend when he can escape all liability by such an agreement [a covenant not to execute], and must take large financial risks by defending." *Id.* at 155, 460 P.2d at 1001. This scenario describes the exact backdrop for the Dam Owners' decision to enter into the settlement agreement here. The Dam Owners were exposed to a significant damages claim and presented with a means of "escape." As the *Damron* court held, if "it appears that the defendant instead of defaulting agrees to perjure himself and testify falsely to statements that are untrue, and that plaintiff is a party to the agreement, or if some other definite evidence of collusion is adduced by proper testimony," then there is a basis for a claim of collusion. *Id.* The facts of record do not establish such a showing here.

## VII.

▮ ¶ 32 Finally, the District argues that the trial court erred in determining that the settlement amount was reasonable. We address this argument in the context of § 57(1), as did the trial judge, and conclude there is no error. We emphasize, as we have throughout, that we are not determining whether this settlement amount constitutes an amount or "a liability" that the District "has an obligation to indemnify." Restatement (Second) of Judgments § 57(1); *supra* ¶¶ 11–15. That determination will be left to the construction of the indemnity clause, which is not before us. The issue here is

---

6. We offer no view as to whether this issue has or has not been resolved in the indemnity action or is at a stage where it can be timely raised if not already presented.

whether there are facts to support the trial judge's determination that the settlement was reasonable. *Falcon v. Beverly Hills Mortgage Corp.*, 168 Ariz. 527, 530–31, 815 P.2d 896, 899–900 (1991) (holding that due diligence review is not "conducted on a de novo basis" but rather is a "question of fact," which can only be set aside if it is "clearly erroneous"). We will not "disturb the findings and judgment of the trial court when supported by substantial evidence." *Cantlay & Tanzola, Inc. v. Senner*, 92 Ariz. 63, 66, 373 P.2d 370, 372 (1962) ("[A]ll the evidence and inferences therefrom must be reviewed by this court in the light most favorable to sustain the judgment of the lower court.").

¶ 33 The initial element to consider when applying § 57(1) to the facts of this case is whether the Dam Owners gave the District "reasonable notice of the action and an opportunity to assume or participate in its defense." Restatement (Second) of Judgments § 57(1). The trial court noted in its findings of fact that "[t]he Dam Owners tendered the defense of the Action to the [District] after service of the Complaint and again before the damages trial. The [District] rejected the tenders." The District does not argue that it was not given reasonable notice or an opportunity to assume or participate in its defense.

■ ¶ 34 We turn now to the primary question of whether the Dam Owners defended the action with "due diligence and reasonable prudence." Restatement (Second) of Judgments § 57(1). In a stipulated judgment situation in which a full adversarial trial was not held, the question of whether due diligence and reasonable prudence were exercised by the indemnitee "extends to the amount of the settlement." *Cunningham*, 194 Ariz. at 241, ¶ 22, 980 P.2d at 494. Other factors that might indicate that a defendant-indemnitee failed to defend the action with due diligence and reasonable prudence include "the swift resolution of a complex action, a lack of discovery, and the failure to interview witnesses." *Id.* at ¶ 21, 980 P.2d 489. Another factor that may be appropriately considered by the trial court is whether "the indemnitee lacked incentive to successfully defend" the action. *Falcon*, 168 Ariz. at 530, 815 P.2d at 899 (noting that the lack of

incentive can be because of "bankruptcy or otherwise").

¶ 35 Here, as described below, there was substantial evidence to support a determination that the Dam Owners had defended the action with due diligence and reasonable prudence. One of the Farmers' attorneys testified at the reasonableness hearing that the litigation had cost the Farmers $900,000 at that point. The parties had previously participated in a jury trial, which assigned the Dam Owners eighty percent of the fault. He also testified that the Dam Owners had received from the Farmers detailed statements of their claims.

¶ 36 The Farmers called as a witness an attorney experienced in Arizona flood cases. That attorney spent forty hours reviewing the various appraisals in the case, the owners' statements of damages, the prejudgment interest and 2006 valuation claims, and the rulings by Judges Foreman and O'Melia and other relevant pleadings. After his review, he determined the reasonable settlement value of the Farmers' claim against the Dam Owners to be between $12 and $16 million. In his opinion, the actual settlement figure of $14.75 million was reasonable.

¶ 37 The Dam Owners' attorney also testified at the reasonableness hearing. He testified that he hired an expert appraiser to examine the damage claims made by the Farmers. He further testified that the Dam Owners had already spent approximately $3.5 million defending the claim, including at least $1 million in expert witness fees. He testified that it was the opinion of his clients that the opposition's witnesses were good witnesses and that they anticipated their defenses at trial to be largely or completely unsuccessful. This was not a settlement based upon "the swift resolution of a complex matter" or any lack of discovery or investigation. *Cunningham*, 194 at 241, ¶ 22, 980 P.2d at 494.

¶ 38 The Dam Owners' attorney also testified about the negotiations leading up to the settlement agreement, stating that they were all arm's-length negotiations, without fraud or collusion. He testified that he continued to assert his client's defenses during the negotiations. The Dam Owners' attorney

also testified that he was told by the Dam Owners' liability insurer that the Dam Owners' risk was between $20 and $25 million. The District, on the other hand, produced evidence that the maximum amount of damages the Farmers ever claimed against the District was $11.29 million. The District also pointed out that the Farmers' trial counsel understood that the damages were approximately $10.76 million.

¶ 39 A primary aspect of the District's argument is that the settlement amount was unreasonable because it was accompanied by an agreement not to execute. We perceive this argument in part to be that which we addressed at the outset, namely that the District contends there is no right to enter into a *Damron/Morris* agreement in a non-insurance setting. For the reasons set forth in section III, we reject that argument. As provided earlier, however, those considerations present a potential fact question for the indemnity case: to determine whether the amounts that the parties expressly agreed to exempt the Dam Owners from payment were contemplated as a "liability" under the terms of the indemnity agreement. *Supra* ¶ 28, 980 P.2d 489.

¶ 40 The District also makes the point, from *Falcon*, that the Dam Owners "lacked incentive to successfully defend," 168 Ariz. at 530, 815 P.2d at 899, because of the covenant not to execute. In Arizona, trial judges are assumed to follow the law unless something in the record leads to a contrary conclusion. *In re Niky R.*, 203 Ariz. 387, 392, ¶ 21, 55 P.3d 81, 86 (App.2002). Here, in addition to § 57(1), the trial judge also applied the standard from *Morris* as to the reasonableness hearings. As *Morris* held, "[t]he test as to whether the settlement was reasonable and prudent is what a reasonably prudent person in the insureds' position would have settled for on the *merits* of the claimant's case." 154 Ariz. at 121, 741 P.2d at 254. We have construed a "reasonably prudent person" to be "a person who has a stake in the outcome," "who is making decisions as though the money that pays the settlement comes from his or her own pocket. This is not a test of what a reasonably prudent person would settle the case for with someone else's funds." *Himes v. Safeway Ins. Co.*, 205 Ariz. 31, 39, ¶ 23, 66 P.3d 74, 82 (App.2003). We assume the trial court properly applied this standard. This addresses the argument that "the indemnitee lacked incentive to successfully defend." *Falcon*, 168 Ariz. at 530, 815 P.2d at 899. The trial judge was required to examine the settlement amount as though the Dam Owners had that incentive.

¶ 41 There are facts in the record that support the trial judge coming to the conclusion that the amount here is an amount that would have been paid based on a consideration of all pertinent factors. Because the trial court was presented with sufficient evidence that the settlement amount was reasonable, we will not reweigh that evidence and decide whether or not it is a conclusion that we would have reached. *See State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989). Thus, the District's argument as to reasonableness fails.

## VIII.

¶ 42 For the foregoing reasons we affirm, as modified herein.

CONCURRING: MICHAEL J. BROWN, Presiding Judge and GEORGE H. FOSTER, Jr., Judge.*

---

* NOTE: The Honorable George H. Foster, Jr., Judge of the Maricopa County Superior Court, has been authorized to participate in the disposition of this appeal by the Chief Justice of the Arizona Supreme Court pursuant to Article 6, Section 3 of the Arizona Constitution and A.R.S. §§ 12-145 to 147 (2001).