281 P.3d 1010

TOWN OF MARANA, a political
subdivision and public body,
Plaintiff/Appellant,

v.

PIMA COUNTY, a body politic
and corporate of the State of
Arizona, Defendant/Appellee.

Town of Marana, a political subdivision
and public body, Plaintiff/Appellee,

v.

Pima County, a body politic and Cor-
porate of the State of Arizona,
Defendant/Appellant.

No. 1 CA–CV 11–0381.

Court of Appeals of Arizona,
Division 1, Department E.

June 14, 2012.

Lewis and Roca, LLP by John N. Iurino, Sivan R. Korn, Tucson, Attorneys for Appellant Town of Marana.

Barbara Lawall, Pima County Attorney by Regina Nassen, Deputy County Attorney, Tucson, Attorneys for Appellee Pima County.

## OPINION

HALL, Judge.

¶ 1 Pima County (the County) appeals the superior court's partial summary judgment rulings in favor of the Town of Marana (the Town) holding that the Town has the right to

provide sewer service to its residents, the County has no authority to provide sewer service within the Town's boundaries, and the Town has obtained voter authorization to acquire and operate a sewer system pursuant to Arizona Revised Statutes (A.R.S.) section 9–514 (Supp. 2011). The Town, on the other hand, has appealed the superior court's rulings that certain sewer lines belong to the County, the scope of the parties' intergovernmental agreement (IGA) did not encompass the Marana Wastewater Reclamation Facility (MWRF), and the Town's annexation of the area surrounding and including the MWRF was unlawful and invalid. For the following reasons, we affirm the superior court's rulings that the Town has the paramount statutory authority to provide sewer service to its residents, the scope of the IGA did not encompass the MWRF, and the Town's annexation of the area including the MWRF was invalid. We reverse, however, the superior court's ruling that the Town's 1988 special ballot measure satisfied A.R.S. § 9–514.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 The Town incorporated in March 1977. In 1979, the Town and the County entered into the IGA for the purpose of constructing, operating and maintaining sewer facilities within the Town.

¶ 3 In its preamble, the IGA noted that "prior to and following incorporation the Town [ ] had its sewerage needs supplied and administered by the County's Sanitation Department." The IGA further acknowledged that the County is authorized to operate sewer facilities pursuant to A.R.S. § 11–264 (2012) and the Town is authorized to construct and maintain sewer facilities pursuant to A.R.S. § 9–240(B)(5)(a) (2008). The IGA then stated that the "County shall, through its Wastewater Management Department . . . administer and manage, in accordance with sound engineering policy and with agreement of the official engineering consultant of Town, the present and future sewer facilities within the boundaries of Town." "As consideration for its obligations," the IGA permitted the County to collect connection fees and sewer user fees from the Town's residents.

¶ 4 Pursuant to its express terms, the IGA would remain in effect "until terminated by either party hereto at will upon the giving of six months' written notice." Upon termination, "ownership of all property relating to flow-through sewer facilities" remained vested with the County and "the remainder of the sewer system within the corporate limits of Town that is not a flow-through system [became] the property of Town."

¶ 5 In a special election the Town held on March 29, 1988, voters approved a ballot measure authorizing the Town to "construct, purchase, acquire, lease, own, and operate a municipal wastewater and sewer system." Following the election, however, the Town did not pursue the construction or acquisition of a wastewater and sewer system and the County continued to provide all sewer service to the Town.

¶ 6 In a newspaper article published June 14, 2007, the Town's manager, Mike Reuwsaat, explained that the Town had attempted, unsuccessfully, to purchase the MWRF from the County as a means of providing the Town with additional water (effluent) resources. Reuwsaat further explained that, because the purchase negotiations failed, the Town was "exploring" the "possibilit[y]" of "seiz[ing] control" of the MWRF pursuant to a term in the IGA. In the same article, the Town Attorney, Frank Cassidy, stated that the Town was "considering annexing the plant to place it within town limits, then severing the agreement." On July 11, 2007, the Town provided the County with the requisite six-month notice that it was terminating the IGA.

¶ 7 On July 24, 2007, the Pima County Board of Supervisors enacted a resolution designating an area including the MWRF as a public park, thereby prohibiting annexation of the MWRF by the Town without the County's permission pursuant to A.R.S. § 9–471(Q) (Supp.2011). On July 25, 2007, the Town filed a blank annexation petition in the office of the Pima County Recorder.

¶ 8 On October 17, 2007, the Town filed a complaint in Pima County Superior Court seeking declaratory judgment, injunction, and special action relief. Specifically, the

Town requested declaratory and special action relief allowing the Town to "take possession of the Marana Sewer Facilities," including the MWRF because all sewage treated at the MWRF "comes from customers located within Marana." The Town also requested a preliminary injunction requiring the County "to continue to treat all sewage generated by Marana customers until such time as Marana can construct adequate treatment facilities."

¶ 9 In its November 6, 2007 answer, the County asserted that the Town has no legal authority to construct or operate sewage treatment facilities. The County further alleged that the Town could not annex the area surrounding the MWRF because it is a County park and the County did not consent to the annexation.

¶ 10 On December 4, 2007, the Town adopted an ordinance annexing the MWRF. On December 20, 2007, the Pima County Board of Supervisors filed a verified complaint challenging the annexation. The Town filed a motion to consolidate the cases, which the superior court granted. The superior court also granted the Town's motion to transfer the venue from Pima County to Maricopa County.

¶ 11 On March 5, 2008, the Town filed a motion for partial summary judgment. First, the Town argued it was entitled to summary judgment declaring that the sewage conveyance system, "as well as any other sewer lines that are not flow-through sewers," became the Town's property on January 11, 2008, the date the IGA terminated. Specifically, the Town asserted that, as a matter of law, the MWRF is the Town's property because it only treats sewage generated in the Town and does not transmit sewage from upstream property. Second, the Town argued that it was entitled to summary judgment declaring that it has the authority to operate a sewer system pursuant to A.R.S. § 9–240(B)(5)(a). As a corollary, the Town also contended it was entitled to summary judgment declaring that, under A.R.S. § 9–104(B) (2008), the County has no authority to provide sewer services to customers residing in the Town without the Town's consent. Third, the Town requested summary judgment declaring that, under

A.R.S. § 9–522 (2008), it was not required to satisfy the voting requirements of A.R.S. § 9–514(a) before operating a sewer system within the Town's boundaries. Even assuming that it was required to comply with A.R.S. § 9–514, however, the Town further asserted it was entitled to summary judgment declaring that the passage of its 1988 special election ballot measure satisfied the statutory requirements. Fourth, the Town requested summary judgment declaring that it properly annexed the MWRF into the Town. Indeed, the Town asserted that, as a matter of law, the County could not prevent the Town's annexation of the MWRF by designating the MWRF and surrounding area a County park and that its attempt to do so violated the covenant of good faith and fair dealing implied in the IGA.

¶ 12 In its opposition to the motion for summary judgment, the County primarily argued that the Town's interpretation of the IGA "is moot" because the MWRF is not located within the Town's limits and the County Board of Supervisors designated the MWRF and surrounding area a park, which prevented the Town from annexing the MWRF without the County's permission. Secondarily, the County also argued that the MWRF does not qualify as part of the Town's "sewer facilities" or "sewer system" as those terms are used within the IGA. On May 12, 2008, the County filed a supplement to its opposition to the motion for summary judgment arguing that the Town must "satisf[y] various statutory and regulatory requirements" before it may own and operate a sewer system that serves its residents. The County noted that, pursuant to Section 208 of the Clean Water Act, 33 U.S.C. § 1288, it is one of two agencies authorized to operate a wastewater treatment facility in the area and asserted that the Town is not presently authorized to operate a wastewater treatment facility under federal law. Additionally, the County argued that, pursuant to A.R.S. § 9–514, the Town "must hold an election on the specific question of whether or not to acquire the Pima County sewage collection system" before taking over the sewer utility. Finally, in a footnote, the County also claimed that, as set forth in A.R.S. § 9–516 (2008), the

Town may not compete with the County's existing utility service.

¶ 13 After hearing oral argument on the motion and taking the matter under advisement, the Honorable Kristin Hoffman granted partial summary judgment in favor of the Town, stating in relevant part:

The Court finds that Marana has the right to operate a sewer system that serves its residents. To the extent that A.R.S. § 9–514 is applicable, Marana has held an election and was granted that authority. Upon termination of the IGA, [it is] entitled to ownership of the non flow-through sewer system in the town. The Court does not have information allowing it to determine which sewers or pumping stations are part of the flow-through or non flow-through systems within Marana. The Court finds that Pima County received its authority to provide sewer service within Marana through the IGA. Without a valid IGA, it does not have the authority to provide sewer service within Marana pursuant to A.R.S. § 9–104(b). Marana has the authority to provide sewer service under A.R.S. § 9–240(B)(5)(a).

On the record before it, the Court makes no determination regarding whether or not the Pima County Board of Supervisors properly included the Marana WTF within the boundaries of Anza Park, whether or not Marana properly annexed the Marana WTF or whether or not the parties to the IGA intended that any non flow-through wastewater treatment facility within Marana would become the property of Marana upon termination of the IGA.

IT IS ORDERED granting summary judgment in part, finding that Marana owns the non flow-through portion of the sewer system within the town, finding that Marana has the right to operate a sewer system that serves its residents, and finding that Pima County has no authority to provide sewer services in Marana without Marana's permission.

¶ 14 The case was then reassigned to the Honorable J. Kenneth Mangum. The County filed a motion for reconsideration, which the court denied, stating in relevant part:

Pima County cites A.R.S. § 11–264(A) as authority for it to operate and to continue to operate the sewer system without further authorization of the cities or other bodies in Pima County. However, the statute doesn't require Pima County to continue to operate a sewer system. The Court has found that Pima County, through it[s] Intergovernmental Agreement[ ], voluntarily allowed the Town of Marana to take action allowing it, Marana, to take over the part of the sewer system in it[s] territorial limits.

. . . .

This Court agrees that A.R.S. § 9–104(B) does not obligate a town to install sewers and drains. At the same time, it *does* authorize a town to operate a sewage system, assuming that other laws and regulations are followed.

¶ 15 The matter proceeded to an evidentiary hearing to determine which portions of the Town's sewer system are "flowthrough," and therefore the property of the County, and which segments are "not flow-through," and therefore the property of the Town. After hearing from numerous witnesses and experts, as well as receiving dozens of exhibits during the six-hour hearing, Judge Mangum entered a twenty-six page minute entry detailing the division of the Town's sewer system. He ultimately concluded that the Town "is entitled to receive transfer of all sewer lines located within its jurisdictional boundaries, other than the sewer reaches depicted on County Maps 1 and 2 as flow-through sewer lines."

¶ 16 Next, the matter proceeded to a bench trial to determine whether the MWRF became the property of the Town upon termination of the IGA, presenting two discrete issues for the court's determination: (1) whether the MWRF is part of the Town's "sewer facilities" and therefore within the scope of the IGA, and (2) whether the Town's annexation of the MWRF was lawful or invalidated by the County's designation of the MWRF and surrounding area as a public park.

¶ 17 On June 7, 2010, after a two-day trial, the court issued a signed thirty-eight page minute entry ruling concluding that the

MWRF is not part of the "sewer facilities" contemplated by the IGA, the County's designation of the land including and surrounding the MWRF was "proper," and the Town's annexation of that area was therefore "defective and unlawful."

¶ 18 Thereafter, the County filed a motion for new trial on the October 2008 partial summary judgment ruling by Judge Hoffman that the County lacked statutory authority to provide sewer service to the Town, which Judge Mangum denied. In its final judgment incorporating the October 8, 2008 partial summary judgment rulings and the June 7, 2010 bench trial rulings, the court granted the County attorneys' fees in the amount of $170,282.10 and costs in the amount of $5,053.45. The Town and the County timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B) (Supp.2011).

## DISCUSSION

¶ 19 The County raises two issues in its appeal: (1) whether the superior court erred by finding the Town has the right to provide sewer services to its residents and prohibit the County from providing such services, and (2) whether the superior court erred by finding the Town's 1988 special election ballot measure satisfied the voter-approval requirement of A.R.S. § 9–514. The Town, on the other hand, raises the following issues: (1) whether the superior court erred by finding the Continental Ranch and Oasis Hills Sewer Lines are part of the "flow-through" sewer facilities that remained property of the County upon expiration of the IGA, (2) whether the superior court erred by finding that the MWRF remains the County's property because it is outside the scope of the IGA, and (3) whether the superior court erred by finding the Town's annexation of the MWRF was invalid because the Town did not receive the County's consent. We address each issue in turn.

¶ 20 "The interpretation of a statute is a question of law that we review de novo." *Bonito Partners, LLC v. City of Flagstaff,* 229 Ariz. 75, 83, ¶ 30, 270 P.3d 902, 910 (App.2012). "When construing a statute, we examine its individual provisions in the context of the entire statute to achieve a consis-tent interpretation." *Id.* (citation omitted). "Indeed, if statutes relate to the same subject and are thus *in pari materia,* they should be construed together ... as though they constituted one law." *Id.*

¶ 21 We likewise review the interpretation of a contract de novo. *Rand v. Porsche Fin. Servs.,* 216 Ariz. 424, 434, ¶ 37, 167 P.3d 111, 121 (App.2007). When the terms of an agreement are clear and unambiguous, we give effect to the agreement as written. *Goodman v. Newzona Inv. Co.,* 101 Ariz. 470, 472, 421 P.2d 318, 320 (1966). If the terms of the agreement are ambiguous, "parol evidence may be used to explain [the ambiguity], but in the absence of fraud or mistake, it may not be used to change, alter or vary the express terms in a written agreement." *Brand v. Elledge,* 101 Ariz. 352, 358, 419 P.2d 531, 537 (1966). When parties submit competing interpretations of a contract's meaning, the court should consider "the offered evidence and, if [the court] finds that the contract language is reasonably susceptible to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993) (internal quotation omitted). "Whether contract language is reasonably susceptible to more than one interpretation so that extrinsic evidence is admissible is a question of law." *Id.* at 158–59, 854 P.2d at 1144–45.

¶ 22 When the meaning of a contractual provision remains unclear after consideration of the parties' intentions, "a secondary rule of construction requires the provision to be construed against the drafter." *MT Builders, L.L.C. v. Fisher Roofing, Inc.,* 219 Ariz. 297, 302, ¶ 10, 197 P.3d 758, 763 (App.2008). We do not resort to this secondary rule "unless other interpretive guides fail to elucidate a clause's meaning." *First Am. Title Ins. Co. v. Action Acquisitions, L.L.C.,* 218 Ariz. 394, 397, ¶ 8, 187 P.3d 1107, 1110 (2008); *see also Taylor,* 175 Ariz. at 158 n. 9, 854 P.2d at 1144 n. 9 (explaining that the rule that ambiguities should be construed against the drafter "is subordinate to the rule that the intent of the parties should govern").

## I. The Summary Judgment Rulings

¶ 23 A court shall grant summary judgment when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1). In reviewing a summary judgment, our task is to determine de novo whether any genuine issues of material fact exist and whether the superior court correctly applied the law. *L. Harvey Concrete, Inc. v. Agro Constr. & Supply Co.*, 189 Ariz. 178, 180, 939 P.2d 811, 813 (App.1997). We review the facts in the light most favorable to the party against whom summary judgment was entered, *Riley, Hoggatt & Suagee P.C. v. English*, 177 Ariz. 10, 12–13, 864 P.2d 1042, 1044–45 (1993), and will affirm the entry of summary judgment if it is correct for any reason. *Hawkins v. State*, 183 Ariz. 100, 103, 900 P.2d 1236, 1239 (App. 1995).

### A. The Right to Provide Sewer Services within the Town

¶ 24 The County contends that the superior court erred by finding that the Town "has the right" to operate a sewer system that serves its residents pursuant to A.R.S. § 9–240(B)(5)(a) and that the County, in the absence of a valid IGA, "does not have the authority to provide sewer service within [the Town] pursuant to A.R.S. § 9–104(B)." First, the County asserts that it has the authority to provide sewer service throughout the County, including within the Town, pursuant to A.R.S. § 11–264. Second, the County contends that the Town may not exercise its statutory authority to provide sewer service to its residents until after it "acquire[s]" the "portion of the County system that serves Town residents as required by A.R.S. §§ 9–515(A) [ (2008) ] and –516(A)."

¶ 25 In response, the Town first argues that the County failed to raise any argument regarding A.R.S. §§ 9–515 and –516 in the superior court and these claims are therefore waived. Second, the Town asserts that, pursuant to the express terms of the IGA, the County acknowledged that its authority to operate a sewer system "was derived" from the Town's consent and therefore it is "equitably estopped from taking a contrary position." Third, the Town argues that, pursuant to statute, it has the "primary, governmental authority" and "dominant right" to provide sewer service to the Town's residents. Finally, the Town contends that the County is not providing services to the Town "under an existing franchise" and that the Town is not attempting to create a "competing service," but simply "continue the same sewer service" as provided before termination of the IGA, and therefore neither A.R.S. §§ 9–515 nor –516 is applicable.

¶ 26 The County has the statutory authority to operate a sewer facility pursuant to A.R.S. § 11–264(A), which provides:

[A]ny county with a population between one million and two million persons may purchase, construct or operate a sewage system, including the collection, transportation, pumping, treatment and disposal of sewage, and charge fees and levy taxes therefor, provided the county secures the assent by resolution of the governing bodies of those incorporated cities and towns representing not less than one-half of the population of the county before purchase, construction or operation of a sewage system, provided that once an initial assent is given no further assent is necessary to operate or improve the system.

Indeed, as set forth in A.R.S. § 9–104(B) (2008), the County is required to provide services at its own expense, including sewers and sewage disposal services, to a newly incorporated town until July 1 following the town's incorporation "or until such time prior to the end of such fiscal year as the governing body of such [ ] town, by resolution or conflicting ordinances, provides such services." The Town also has the authority to "construct and maintain" sewer facilities pursuant to A.R.S. § 9–240(B)(5)(a).

¶ 27 Viewing these statutes together, and as applicable here, the County had the authority to provide sewage service to the unincorporated area that eventually became incorporated as the Town. Upon the Town's incorporation in March 1977, the County was required, under A.R.S. § 9–104(B), to continue to provide that service until July 1, 1977, or until such time as the Town assumed

responsibility for providing such service, if the Town did so before the end of the fiscal year. As of July 1, 1977, the County was relieved of its statutory obligation to provide sewer service to the Town at its own expense. Section 9–104(B), however, did not *require* that the County terminate its service at that time. Nonetheless, the statute clearly establishes that, as of July 1, 1977, the Town assumed the responsibility for providing its own sewage service. Thus, by statute, the Town's authority to provide sewer service to its residents became paramount.[1]

¶ 28 Equally important, the IGA did not modify the authority accorded to each governmental entity by statute. Rather, the IGA recognized that the County and the Town both have the statutory authority to provide sewer service and declared that the two governmental entities would "jointly exercise their powers," with the County retaining the responsibility to construct and operate the sewage system. Indeed, the IGA specifically stated that "[n]othing in this Agreement shall be construed as either limiting or extending the statutory jurisdiction of either of the parties hereto" and noted that "[a]ll powers granted to County herein shall be subject to and controlled by ... the Town." Moreover, the IGA clearly contemplated that the Town could, at its election, terminate the County's sewer service with a six-month notice of termination and independently provide sewer service to its residents, as demonstrated by Section 12 which allocated all "not [ ] flow-through" sewage facilities to the Town upon termination of the contract.

¶ 29 Reading these contractual provisions in light of the relevant statutes, the Town initially exercised its statutory authority to construct and maintain sewer facilities by contracting with the County to provide that service. On July 11, 2007, however, the Town gave notice that it was exercising its right under the IGA to terminate the contract for service with the County and electing instead to provide sewer service to its residents directly, which it is statutorily authorized to do pursuant to A.R.S. § 9–240(B)(5)(a). Therefore, the superior court did not err by finding that the Town has the right to operate and maintain a sewer system to serve its residents and that its statutory authority is paramount such that the County does not have the power to compel the Town to accept its service.

¶ 30 The County nonetheless contends that the Town may not exercise its statutory authority to provide sewer service to its residents until it complies with A.R.S. §§ 9–515(A)[2] and –516(A). In response, the Town asserts that the County waived these claims by failing to raise them in the superior court. The County did not raise any issue regarding A.R.S. § 9–515(A) in the superior court, and we therefore do not consider it. *See Englert v. Carondelet Health Network,* 199 Ariz. 21, 26, ¶ 13, 13 P.3d 763, 768 (App. 2000) (explaining appellate courts generally do not consider issues raised for the first time on appeal). As noted above, *supra* ¶ 12, however, the County raised a claim regarding A.R.S. § 9–516(A), albeit minimally, in its supplemental memorandum opposing the Town's motion for summary judgment, and the issue is therefore preserved for appellate review.[3]

¶ 31 As set forth in A.R.S. § 9–516(A):

[W]hen adequate public utility service under authority of law is being rendered in an area, within or without the boundaries of a city or town, a competing service and installation shall not be authorized, instituted, made or carried on by a city or town corporation, before constructing, purchasing, acquiring or leasing, in whole or in part, a plant or property engaged in the business of supplying services rendered by such public utility, shall first purchase and take over the property and plant of the public utility.

---

1. Because we conclude that the Town's authority to provide sewer service to its residents is paramount pursuant to statute, we need not address the Town's alternative argument that the County is equitably estopped from challenging the Town's statutory authority.

2. Section 9–515(A) states:
   When a municipal corporation and the residents thereof are being served under an existing franchise by a public utility, the municipal

3. Indeed, the Town responded to the County's A.R.S. § 9–516 argument in the Town's reply in support of its motion for summary judgment.

unless or until that portion of the plant, system and business of the utility used and useful in rendering such service in the area in which the city or town seeks to serve, has been acquired.

¶ 32 The County maintains that the "only logical way to reconcile" the IGA with A.R.S. § 9–516(A) "is to interpret the IGA to mean that if the Town takes over the provision of sewer service in the Town" it must acquire (purchase) the portion of the County system that serves Town residents as required by A.R.S. § 9–516(A), but the Town will not be required to pay the County for the value of the non flow-through sewer lines within Town limits. In response, the Town asserts that A.R.S. § 9–516 is inapplicable because the Town is not attempting to institute a "competing service," but instead will simply "continue the same sewer service [provided] to its residents as before the termination of the IGA, using the same non flow-through sewer facilities used during the 1979 IGA period."

¶ 33 We agree that the Town is not required to purchase the non flow-through sewer facilities used during the 1979 IGA period because, pursuant to Section 12 of the IGA, the Town acquired that property from the County upon termination of the agreement. As discussed *infra* ¶¶ 47–60, however, Judge Mangum did not err by finding that the Town did not acquire certain flow-through portions of the sewer system located within the Town or the MWRF upon termination of the IGA. Thus, the Town acquired only the property necessary to transport sewage, not the property necessary to treat the sewage. Therefore, the Town has the statutory authority to maintain and control the non flow-through sewer system it acquired when the IGA expired, but, pursuant to A.R.S. § 9–516, it may not institute "a competing service," that is, offer wastewater treatment of its residents' sewage, without first purchasing the MWRF from the County. *Cf. Ariz. Water Co. v. City of Bisbee,* 172 Ariz. 176, 178, 836 P.2d 389, 391 (App.1991) (holding that the city's delivery of effluent from its sewage treatment facility did not render it a competitor to Arizona Water in violation of A.R.S. § 9–516 "[b]ecause effluent is not the same as the water Arizona Water provides to its service area").

### B. Voter Approval Pursuant to A.R.S. § 9–514

¶ 34 Next, the County asserts that, under A.R.S. § 9–514, the Town cannot "acquire and operate the portion of the County sewer system currently serving the Town" until the Town's voters "approve the Town's actual acquisition of sewer infrastructure in this case." Specifically, the County argues that the Town's 1988 special election failed to satisfy A.R.S. § 9–514's voter approval requirement because the ballot measure did not "reference a specific project" and only provided "general approval."

¶ 35 In response, the Town counters that A.R.S. § 9–514 is inapplicable because the statute only applies when a municipality takes over the operation of services "rendered by a public utility," not when a municipality takes over the operation of services rendered by another governmental entity. Likewise, the Town asserts that A.R.S. § 9–514 is inapplicable here because the Town is not attempting to construct, purchase, acquire or lease a utility; rather, it intends to simply own and maintain the utility. Even assuming that the statute is applicable, the Town further argues that its 1988 special election fully satisfied the voter-approval requirements.

¶ 36 Section 9–514(A) provides in relevant part:

[B]efore construction, purchase, acquisition or lease by a municipal corporation, . . . of any plant or property or portion of plant or property devoted to the business of or services rendered by a public utility shall be undertaken, the construction, purchase, acquisition or lease shall be authorized by the affirmative vote of a majority of the qualified electors who are taxpayers of the municipal corporation voting at a general or special municipal election duly called and held for the purpose of voting upon the question.

¶ 37 In its special election held March 29, 1988, the Town submitted the following measure to its voters:

SHALL THE TOWN OF MARANA BE AUTHORIZED TO CONSTRUCT, PURCHASE, ACQUIRE, LEASE, OWN AND OPERATE A MUNICIPAL WASTEWATER AND SEWER SYSTEM?

¶ 38 First, we must determine whether A.R.S. § 9–514 is applicable here. Chapter 5 of Title 9, entitled "Public Utilities," does not contain a definition of the term "public utility." Section 9–521 (2008), however, broadly defines a "utility undertaking" as any "[e]lectric light or power, water, storm water, sewer, gas, common carrier of passengers, garbage, or rubbish plant or system, including but not limited to disposal, treatment or reduction plants, buildings, incinerators, dams and reservoirs." Likewise, in *City of Mesa v. Salt River Project Agricultural Improvement and Power District*, the supreme court defined the scope of the term "public utility" expansively and determined that a political subdivision of the state that engages "in a business traditionally affected with public interest" operates as a "public utility." 92 Ariz. 91, 97, 373 P.2d 722, 726 (1962) (holding A.R.S. § 9–516 barred the City of Mesa from providing a competing electrical service to its residents); *see also Trico Elec. Coop., Inc. v. Corp. Comm'n of Ariz.*, 86 Ariz. 27, 38, 339 P.2d 1046, 1054 (1959) ("A public utility is a person, corporation or other association carrying on an enterprise for the accommodation of the public[.]"). Therefore, we conclude that the County, in providing sewage and wastewater treatment, operates as a public utility.

¶ 39 Contrary to the Town's argument, we also conclude that A.R.S. § 9–514 is applicable notwithstanding the IGA. Although the Town contends it is not attempting to acquire property from the County for purposes of A.R.S. § 9–514, but simply continue operating the existing sewer system that became its property upon the expiration of the IGA, as discussed *infra* ¶¶ 47–60, we conclude that some portions of the sewer system and the MWRF did not become the Town's property at the time the IGA expired, and therefore the Town must "acquire" the MWRF from the County before it may provide wastewater treatment to its residents.

¶ 40 The remaining question then, is whether, as found by Judge Hoffman, the Town held a qualifying election and was granted the requisite authority by its voters.

¶ 41 The ballot measure the Town submitted to its voters tracked the statutory language, requiring the voters to decide whether the Town should be authorized to construct, purchase, acquire, or lease a municipal wastewater and sewer system. Pursuant to the measure's unambiguous terms, the voters were informed that they were determining whether to give the Town the authority to finance and operate a wastewater and sewer system. We conclude, nonetheless, that this measure did not satisfy the statutory requirements.

¶ 42 As relevant here, A.R.S. § 9–514(A) states that "before ... acquisition ... of any plant or property. devoted to the business of or services rendered by a public utility shall be undertaken, *the* ... acquisition ... shall be authorized by the affirmative vote of a majority of the qualified electors ... at a general or special municipal election duly called and held for the purpose of voting upon *the question*." (Emphasis added). When construing a statute, we "must, if possible, give meaning to each clause and word in the statute or rule to avoid rendering anything superfluous, void, contradictory, or insignificant." *Devenir Assocs. v. City of Phoenix*, 169 Ariz. 500, 503, 821 P.2d 161, 164 (1991). Thus, applying this rule of statutory construction, the legislature's use of the word "the" must be given meaning. In the absence of a contrary definition, the word "the" is defined by its "[u]se[ ] before singular or plural nouns and noun phrases [to] denote *particular* persons or things." Webster's II New College Dictionary 1143 (1995) (emphasis added); *see* A.R.S. § 1–213 (2002) ("Words and phrases shall be construed according to the common and approved use of the language."); *see also Urias v. PCS Health Sys., Inc.*, 211 Ariz. 81, 85, ¶ 22, 118 P.3d 29, 33 (App.2005) ("If the legislature has not defined a word or phrase in a statute, we will consider respected dictionary definitions."). Applying the word's ordinary meaning here, we conclude that the statute requires a municipality to obtain from its

voters the authority to acquire a *particular* plant or property.

¶ 43 Our construction of the statute is further supported by *City of Casa Grande v. Arizona Water Co.*, 199 Ariz. 547, 20 P.3d 590 (App.2001), in which we likewise concluded that A.R.S. § 9–514 requires a municipality to obtain specific rather than general authority. In that case, the City sought to acquire a portion of the Arizona Water Company's public utility property in Pinal County through a condemnation action. 199 Ariz. at 548, ¶ 1, 20 P.3d at 591. The Arizona Water Company contested the City's right to condemn the property under A.R.S. § 9–514, arguing the City had not first obtained the requisite voter approval. *Id.* at 549, ¶ 3, 20 P.3d at 592. The superior court dismissed the City's condemnation action, finding the City had not obtained the voter approval required by statute. *Id.* at 549, ¶ 4, 20 P.3d at 592. On appeal, as in the superior court, the City argued that, "because its charter, adopted in 1975, grants it general authority to engage in the public utility business, it was not required to hold a public election pursuant to § 9–514 on whether it could acquire the portions of [Arizona Water Company's] assets it sought." *Id.* at 550, ¶ 7, 20 P.3d at 593.

¶ 44 We held that the City's charter, which provided that the City "shall have the power to own and operate any public utility . . . and to lease or purchase any existing utility properties used or useful to public service" did not satisfy the "common sense meaning of the language [of § 9–514, *which* ] *calls for voter approval of a particular project, not general authority*." *Id.* at 550, 554, ¶¶ 7, 22, 20 P.3d at 593, 597 (emphasis added). Likewise, we held that the City's (then a Town) 1916 election "to determine whether the town should be allowed to issue and sell bonds 'for the purpose of installing a Town water plant, a Town electric light and power plant and a Town ice plant' " did not provide the specific authority necessary to satisfy the statutory voting requirement. *Id.* at 554, ¶ 22, 20 P.3d at 597. We further concluded that the question A.R.S. § 9–514 required the City to place before the voters was whether "the City has authority to acquire [Arizona Water

Company's] property for the purpose of operating a utility." *Id.* In reaching this conclusion, we found that "[c]onstruing the voter approval the City obtained at either election as sufficient to satisfy the requirements of § 9–514 would compel us to torture the meaning of the language 'voting upon the question.' " *Id.*

¶ 45 In this case, the relevant "question" was whether the Town should be granted the authority to acquire the MWRF for the purpose of operating a wastewater treatment utility. It is not our task to formulate the exact wording of a ballot measure that would comply with A.R.S. § 9–514, and we do not attempt to do so here. But we conclude that the 1988 ballot measure did not adequately submit this question to the Town's residents. Therefore, the superior court erred by finding the Town had satisfied A.R.S. § 9–514's voter-approval requirement.

## II. The Bench Trial Rulings

¶ 46 We defer to a superior court's findings of fact unless clearly erroneous, but we review its conclusions of law de novo. *Casa Grande*, 199 Ariz. at 555, ¶ 27, 20 P.3d at 598. We view the evidence and all reasonable inferences in the light most favorable to sustaining the superior court's ruling. *Inch v. McPherson*, 176 Ariz. 132, 136, 859 P.2d 755, 759 (App.1992).

### A. The Division of the Town's "Sewer Facilities"

¶ 47 The Town argues that the superior court erred by finding that "the sewer lines [ ] built by the developers of Continental Ranch and Oasis Hills" constituted "flow-through sewer facilities" as defined by the IGA and therefore remained the property of the County upon the contract's termination.

¶ 48 Section 12 of the IGA states:

Town shall permit County to secure rights-of-way and to build a flow-through sewer system containing interceptors, trunk and main lines in the corporate limits of Town to connect the County sewer system outside Town. Ownership of said flow-through system shall be in County during the term of this Agreement, and upon termination of this Agreement, ownership of all property

relating to flow-through sewer facilities shall remain vested in County. On termination, the remainder of the sewer system within the corporate limits of town that is not a flow-through system shall become the property of Town.

In Section 5, the IGA defines certain relevant terms:

House connection: the pipe carrying wastewater from the building to a common sewer;

Lateral sewer: a sewer that discharges into a main or trunk sewer and has no other common sewer as a tributary to it;

Flow-through sewer: a sewer for transmission of sewerage from the upstream property, traversing the subject property (Town of Marana), to connect with downstream facilities;

Main sewer: principal sewer to which other sewers and sub-mains are tributary; also called a trunk sewer;

Trunk sewer: a system of major sewers serving as transporting lines and not as local or lateral sewer;

Interceptor sewer: sanitary sewer that receives wastewater flow from trunk sewers and main sewers and transports or conducts such wastewater to a point for treatment or disposal.

¶ 49 On November 18, 2009, the superior court held an extensive hearing to determine whether certain sewer lines are "flow-through" sewers within the meaning of the IGA. At the hearing, sixteen sewer lines remained the subject of dispute. In its detailed minute-entry ruling, the superior court made numerous findings of fact and conclusions of law relevant to this issue:

8. Pima County has presented overwhelming evidence that each of the disputed sewer lines was purposely constructed to carry sewage from property located in Pima County. Regardless, Marana contends that the lines should not be considered "flow-through" because some of the lines do not yet carry sewage from the County, the quantity of sewage other lines do carry from upstream County properties is a relatively small amount, and/or the lines do not have a sufficient number of connections to be characterized as a "main" sewer line. These contentions are not supported by the evidence or the terms of the 1979 IGA.

. . . .

28. All of the sewer lines identified by Pima County as flow-through sewer lines are main, trunk, or interceptor sewers.

. . . .

31. There is nothing in the 1979 IGA's definition of flow-through sewer that requires a flow-through line to begin in the unincorporated County. . . . The IGA's definition of flow-through sewer is "a sewer for transmission of sewage from the upstream property, traversing the subject property (Town of Marana), to connect with downstream facilities."

. . . .

73. If Pima County loses ownership of disputed reaches such as those in the Continental Ranch area, it might not be able to provide sewer service to County residents in the unincorporated areas adjacent to the disputed reaches who want to connect to the sewer system.

. . . .

175. In this case, neither party has disclosed or offered any witness with contemporaneous knowledge of the negotiation for or drafting of the 1979 [IGA]. Therefore, the Court is limited to ascertaining the parties' intent and meaning from the words of the 1979 IGA itself.

176. The 1979 [IGA] defines a flow-through sewer as "a sewer *for transmission* of sewage from the upstream property, traversing the subject property (Town of Marana), to connect with downstream facilities."

177. The definition of "flow-through sewer" in the 1979 IGA does not limit flow-through sewers to those that *actually* carry sewage generated from upstream County properties.

178. The parties could easily have chosen to define a flow-through sewer as one that *transmits* "sewage from the upstream property, traversing the subject property (Town of Marana), to connect with downstream facilities." But, they did not. And

their choice of the words "for transmission" must be given meaning.

. . . .

180. The words "for transmission" in the definition of flow-through sewer indicate that it is the functional purpose of the sewer that is determinative, rather than how it is being used at the time.

181. Therefore, the meaning of "flow-through sewer" as used in the 1979 IGA means both sewers that

a. actually carry sewage from upstream County properties, across Marana, to downstream treatment facilities; and

b. were built "for transmission" of future flow-through—*i.e.*, those that do not presently transport sewage from upstream County properties but were built [ ] for the purpose of transmitting sewage from upstream County properties, across Marana, to downstream treatment facilities.

182. Based on evidence presented at the November 18, 2009 evidentiary hearing, Pima County is entitled to retain ownership of the sewer reaches depicted on County Maps 1 and 2 . . . as flow-through sewer lines.

183. Upon compliance with all applicable regulatory requirements necessary for it to operate a wastewater conveyance system and all proper and necessary arrangements having been made for discharge of sewage into a wastewater treatment facility, the Town of Marana is entitled to receive transfer of all sewer lines located within its jurisdictional boundaries, other than the sewer reaches depicted on County Maps 1 and 2 . . . as flow-through sewer lines.

¶ 50 The Town contends that the term "flow-through sewer" system is expressly and narrowly defined by the IGA and therefore the superior court's "resort to testimony and other outside sources to construe the plain meaning of the specifically defined term [ ] was error." The Town further asserts that, applying the express terms of the IGA, the "incidental connections . . . at the ends of the Continental Ranch and Oasis Hills reaches are only 'house connections.'" According

to the Town, "[t]he fact that a mere three county residents were given special permission to connect to Marana's Continental Ranch and Oasis Hills sewer lines years after these sewer lines were constructed is entirely irrelevant" and cannot form the basis for finding that those sewer lines "are part of the County's 'flow-through system.'" Finally, the Town maintains that the superior court erred by finding the term "flow-through sewer facilities" encompasses sewers that were built for the transmission of future flow-through, but do not currently transport sewage from upstream County properties. Instead, the Town asserts that the sewer facilities' status as either "flow-through" or "not a flow-through" was fixed as of the date the IGA terminated based on their actual usage at that time.

¶ 51 Pursuant to Section 12 of the IGA, the County was permitted to build a flow-through sewer system "*containing* interceptors, trunk and main lines in the corporate limits of Town to connect the County sewer system outside the Town." (Emphasis added). As acknowledged by the Town, the County retained ownership of the "flow-through sewer facilities" following termination of the contract to enable the County to continue operating its county-wide sewer system for the benefit of residents in unincorporated County areas. The Town argues, however, that the IGA limited the flow-through system to interceptors, trunk, and main lines. We disagree.

¶ 52 The term "flow-through sewer" is defined by Section 5 of the IGA as "a sewer for transmission of sewerage from the upstream property, traversing the [Town], to connect with downstream facilities." Although Section 12 states that the flow-through system will "contain[ ] interceptors, trunk and main lines," the term "contain," as used within that provision, is illustrative, not exclusive, and does not limit the flow-through system to include only those types of sewers. Instead, the term "flow-through" system encompasses *all* sewers that traverse the Town to connect upstream properties with downstream facilities. Moreover, even accepting the Town's proposition that the flow-through system may consist only of main, trunk, or intercep-

tor sewers, the superior court specifically found that all of the disputed sewers "are main, trunk, or interceptor sewers," and we defer to the court's factual findings.[4] Therefore, we reject the Town's argument that, because the sewer connections to County residents are only "house connections," the corresponding sewers are therefore not part of the flow-through system.[5]

¶ 53 The Town next argues that the superior court erred by finding that sewers that were designed and built to transmit flow-through sewage, but do not currently transmit such sewage, are part of the flow-through system. Again, we disagree.

¶ 54 Section 5 of the IGA defines "flow-through sewer" as "a sewer *for transmission* of sewerage" from upstream County residents, across the Town, to connect with downstream facilities. (Emphasis added). As explained by the superior court, "[t]he words 'for transmission' in the definition of flow-through sewer indicate that it is the functional purpose of the sewer that is determinative, rather than how it is being used at the time." Had the parties defined "flow-through sewer" as a sewer "that transmits" such sewage, the Town's interpretation would be correct. As written, however, the IGA does not limit "flow-through sewers" to "those that *actually* carry sewage generated from upstream County properties."

¶ 55 Accordingly, after receiving testimony and evidence regarding the location, use, and

intended purpose of the disputed sewers, the superior court found that each sewer either collects sewage from unincorporated County connections or extends beyond the Town's boundaries to provide sewer service to future connections in the unincorporated County. We concur with the superior court's interpretation of the relevant terms of the IGA and defer to the court's factual findings, and therefore conclude that the court did not err by finding that each of the disputed sewers was part of the flow-through system that remained the County's property upon termination of the IGA.

## B. The MWRF

■ ¶ 56 The Town contends that the superior court erred by determining that the MWRF remained the County's property upon termination of the IGA because it was outside the scope of the parties' agreement. Specifically, the Town asserts that this construction of the IGA is contrary to the agreement's intended purpose to create a sewer system for the Town and the governing statutory scheme that gives preference to towns, not counties, for the operation of sewer systems.[6] In response, the County argues that the term "sewer system" refers only to sewage conveyance lines, not treatment facilities.

¶ 57 In its signed minute entry ruling, the superior court made the following findings of

4. We reject the Town's argument that the superior court erred by receiving testimony and other evidence at the hearing. Contrary to the Town's claim, the court did not rely on this evidence "to construe the plain meaning" of the IGA. Rather, the court interpreted the meaning of the parties' agreement, and then received evidence to determine which, if any, of the disputed sewers qualified as a "flow-through sewer." The interpretation of the IGA was a legal issue, but the determination whether specific sewers qualified as "flowthrough" was necessarily a factual question for which the superior court properly relied on expert testimony and related evidence.

5. We note that in its opening brief the Town contends, without any citation to the record, that "the County admitted that those houses [meaning the homes of County residents 'hook[ed] up to the Continental Ranch lines'] would continue to receive sewer service if the lines were transferred

to Marana." To the contrary, the superior court specifically found that the County "might not be able to provide sewer service to County residents in the unincorporated areas adjacent to the disputed reaches who want to connect to the sewer system" based on testimony presented at the evidentiary hearing that the County would need to procure another intergovernmental agreement with the Town to continue such service.

6. To the extent the Town also argues that the County may not refuse its voter-approved request to transfer ownership of MWRF pursuant to A.R.S. § 9–514.01 (Supp.2011), we note that this recently enacted statute was not at issue in the superior court and we therefore decline to address its applicability or constitutionality. *See Nat'l Broker Assoc., Inc. v. Marlyn Nutraceuticals, Inc.*, 211 Ariz. 210, 216, ¶ 30, 119 P.3d 477, 483 (App.2005) (explaining that generally "we will not address issues raised for the first time on appeal").

fact and conclusions of law relevant to this issue:

4. The 1979 IGA does not define "sewer system" or "sewer facilities."

5. The definitions contained within the 1979 IGA all concern various kinds of sewer pipes—sewer pipes that transport, carry, conduct, or discharge sewage and/or wastewater.

. . . .

32. There has never been a time (from the 1970s through June 14, 2007) when the MWRF was ever planned to exclusively serve the Town of Marana.

. . . .

64. The 1979 IGA between Pima County and Marana does not contain any provisions providing for the recovery of capital expenses in the event that a treatment facility located in Marana was transferred to the town.

65. The 1979 IGA does not address responsibility for regulatory compliance in operating a wastewater treatment plant in the event it is transferred to Marana.

66. The certified operator of the MWRF is a Pima County employee employed by the Wastewater Department. The 1979 IGA has no provisions for the transfer of that operator's responsibility to Marana.

67. The 1979 IGA does not address the ownership or allocation of effluent.

. . . .

78. In 2006, the Marana town manager actually proposed the purchase of the MWRF.

. . . .

80. [The County Administrator] responded to the Marana town manager that Pima County was not interested in selling the MWRF.

. . . .

86. The discussions between Pima County and Marana regarding obtaining an allocation of effluent and purchasing the MWRF show that Marana did not develop its interpretation of the 1979 IGA until late 2006 or early 2007.

. . . .

206. In this case, neither party has disclosed or offered any witness with contemporaneous knowledge of the negotiation for or drafting of the 1979 IGA. But, the Court finds that the language of the 1979 IGA is reasonably susceptible to Pima County's interpretation that the agreement concerned only sewer pipes and other facilities of the sewer conveyance system located within the corporate limits of Marana, and did not pertain to wastewater treatment facilities. Therefore, the Court will consider extrinsic evidence offered to determine the meaning intended by the parties to the terms "sewer system" and "sewer facilities."

207. Whether the interpretation of the 1979 IGA is based solely on the words used in the agreement or is based on those words and extrinsic evidence of the parties' intent, the Court finds that the termination provision of the agreement does not apply to wastewater treatment facilities.

208. The parties could easily have chosen to define "sewer system" or "sewer facilities" in the 1979 IGA to include wastewater treatment facilities. But, they did not. And the absence of such a definition has consequences because of the commonly accepted English definition of the word "sewer."

209. The definition of the word "sewer" when used as a noun means "an artificial[,] usually subterranean[,] conduit to carry off sewage and sometimes surface water (as in rainfall).

210. When the noun "sewer" is used as an adjective to modify the nouns "system" or "facilities," "sewer system" means a system made up of sewers. Similarly, "sewer facilities" are facilities that are sewers or facilities closely associated with the conveyance of sewage and/or wastewater.

211. Because there is no commonly accepted definition of the word "sewer" that means an industrial plant for the treatment of sewage and/or wastewater, and the commonly accepted definition of the word "sewer" means a conduit to carry off sewage and sometimes surface water, the Court finds that the words "sewer system" or "sewer facilities" as used in § 12 of the

1979 IGA do not support an interpretation of that provision as providing for the transfer of wastewater treatment facilities located within Marana's town limits to Marana upon termination of the 1979 IGA.

212. The Court further finds that the extrinsic evidence offered by Pima County shows that, had the parties intended that wastewater treatment facilities located within Marana's town limits be transferred to Marana on termination of the 1979 IGA, the agreement would have contained other provisions making that intent clear.

. . . .

235. Based on the evidence presented at trial, Pima County is entitled to retain ownership of the MWRF.

¶ 58 Section 12 of the IGA states that, upon termination, "the remainder of the sewer system within the corporate limits of Town that is not a flow-through system shall become the property of Town." As noted in the superior court's detailed minute entry ruling, the IGA does not define the term "sewer system;" instead, its definitional section is limited to defining different types of sewers. The only references to wastewater treatment within the document are: (1) Section 5's definition of "interceptor sewer" as a "sanitary sewer that receives wastewater flow from trunk sewers and main sewers and transports or conducts such wastewater to a point for treatment or disposal," and (2) Section 13's provision stating the "Town shall not grant rezoning or subdivision approvals for developments that will create a health hazard by exceeding the flow and/or treatment capacities of the *County sanitation system*." (Emphasis added).

¶ 59 In the absence of any contrary definition within the IGA, we construe the term "sewer system" by its common, ordinary meaning. *See A Tumbling–T Ranches v. Flood Control Dist. of Maricopa County*, 220 Ariz. 202, 209, ¶ 23, 204 P.3d 1051, 1058 (App.2008). A "sewer" is commonly defined as "[a] manmade, . . . underground conduit for carrying off sewage or rainwater." Webster's II New College Dictionary 1012 (1995). Thus, we agree with the superior court that a "sewer system" is a system comprised of multiple conduits for carrying away sewage.

¶ 60 Nothing in the ordinary meaning of the term "sewer system" suggests that Section 12 of the IGA, which reserved to the Town all portions of the sewer system that are "not a flowthrough system," transferred ownership of the MWRF to the Town upon termination of the contract. Moreover, the only significant reference to wastewater treatment within the IGA, Section 13, refers to wastewater treatment as part of "the County sanitation system" rather than the Town's sewer system. Therefore, the plain language of the IGA clearly supports the superior court's finding that the scope of the property transferred pursuant to Section 12 of the IGA did not encompass the MWRF. We further find no merit to the Town's contention that this plain meaning construction of the IGA is contrary to the governing statutory scheme. Instead, as discussed *supra* ¶¶ 32–33, the relevant statutes provide the Town with the paramount authority to provide sewer service to its residents, but they do not permit the Town to seize the County's wastewater treatment facilities without providing appropriate compensation. *See* A.R.S. §§ 9–104(B); –240(B)(5)(a); –516.

**C. Invalidity of the Town's Annexation**

■ ¶ 61 The Town asserts that the superior court erred in finding that the Town's annexation of the MWRF is invalid because the Town did not obtain the County's consent pursuant to A.R.S. § 9–471(Q). The Town contends that the property the Town annexed does not fit the definition of a "park" and therefore A.R.S. § 9–471(Q) is inapplicable.

¶ 62 Section 9–471 provides cities and towns the authority "to extend and increase [their] corporate limits" through annexation. A city or town may annex unincorporated areas contiguous to its borders without county approval unless the area the city or town proposes to annex "is a county owned park or a park operated on public lands by a county." A.R.S. § 9–471(Q). When the proposed annexation lands include a county park, the city or town must obtain annexation approval from the county board of supervisors. *Id.* "If the board of supervisors does not agree to the annexation, the county owned park or park operated on public lands by a county as

part of a management agreement *shall be excluded from the annexation . . . ." Id.* (Emphasis added).

¶ 63   Pursuant to A.R.S. § 11–932(A) (2012), a county is authorized to "hold, maintain and improve" real property "for the use and purpose of a public park." As defined by statute, a "[p]ublic park" is "a park, parkway, trail, recreational area or playground established, maintained or administered by a county, city or town." A.R.S. § 11–931(3) (2012).

¶ 64   In finding that the area the County has designated as Anza Park, which includes and surrounds the MWRF, is indeed a park, the superior court made over one hundred findings and conclusions, including:

87.   On June 18, 2007 [the County Administrator] sent the County Board of Supervisors a memorandum alerting the Board that Marana believed it could take the MWRF by annexation and termination of the 1979 IGA, and raising the issue of designating the area as a County Park to prevent the annexation.
   . . . .
89.   Parks Director Rafael Payan … wrote a memorandum to the County Board of Supervisors recommending the designation of land in northwest Pima County (including the MWRF) as Anza Park. . . . The memorandum is dated July 11, 2007.
90.   Mr. Payan understood that County Administration had an interest in moving forward on the designation of Anza Park because of a dispute with Marana. But, this came after the Parks Department had already done design work creating concept plans for the use of County wastewater treatment plants, including the MWRF, as parks.
   . . . .
95.   On [July 24, 2007], the Pima County Board of Supervisors, acting within its statutory authority, adopted a resolution designating an area including the Marana WRF as a public park.
   . . . .
139.   Long before Pima County designated Anza Park, the County and its Parks Department had considered and planned to develop parks in connection with County wastewater treatment facilities. . . . (There

have been many plans contemplated or implemented in Pima County with respect to taking advantage of effluent production from facilities for riparian restoration projects).
   . . . .
153.   The Parks Department began conceptualizing plans for turning wastewater treatment facilities into parks in the year 2000[.]
   . . . .
156.   In 2006 or 2007, the Parks Department developed a concept plan for a park incorporating the MWRF called the Juan Bautista de Anza Avian Preserve. The concepts found on the initial master plan for Anza Park were first discussed and considered by the Parks Department long before it ever put anything into a drawing.
   . . . .
166.   Anza Park is planned as a natural resource habitat and avian preserve augmented by the release of effluent to enrich the environment through the restoration of native grasslands, mesquite bosques, and riparian areas. . . . It is planned to have several different trails with interpretative signs and benches; three interpretative kiosks; the "Story of Water" Discovery Center; wildlife viewing areas; picnic tables in three different areas of the park; and a parking area for visitors to the park.
167.   The kind of habitat that the Parks Department is looking to develop at Anza Park is the same kind of habitat that has been developed at the Gilbert Water Ranch and at the Sweetwater Wetlands.
   . . . .
175.   Development on Anza Park has not moved beyond the design stage because of this litigation.
176.   Even though development of the park has stalled, Anza Park is still operating as a natural resource park. . . . I[t] is still operating in the sense that it offers passive recreational opportunities for birding, picnicking, and hiking.
177.   Lands-especially natural areas-often function as parks even before their actual designation as parks.
178.   The fact that a park is not officially open does not make it less of a park.
   . . . .

216. The Court [ ] finds that the Pima County Board of Supervisors' adoption of a resolution designating land including the MWRF as Anza Park was proper.

. . . .

218. No evidence presented at trial would support the conclusion the Pima County Board of Supervisors' adoption of [the resolution designating the area Anza Park] was arbitrary and without factual justification.

. . . .

221. The statutory definition of "public park" does not preclude the designation of a public park that includes within its confines industrial facilities.

. . . .

223. The Court finds, based on all of the evidence presented, that the inclusion of the MWRF is for the "purpose of a public park." The MWRF itself as an industrial facility attracts avian wildlife and birders who desire to observe the birds. The resource produced by the MWRF is integral and necessary to the development and restoration of the planned riparian and meso-riparian habitat features of Anza Park.

. . . .

229. Because Marana did not obtain Pima County's consent to the annexation, the lands designated by the Pima County Board of Supervisors as Anza Park, including the MWRF, is excluded from Marana's annexation.

¶ 65 As noted by the County, A.R.S. § 11–931(3) does not define "park," but rather includes the term in its definition of a "public park." In the absence of a statutory definition, we apply the term's ordinary meaning. *See A Tumbling–T Ranches*, 220 Ariz. at 209, ¶ 23, 204 P.3d at 1058. A park is commonly defined as: (1) "[a]n expanse of enclosed grounds for recreational use[,]" (2) "[a] landscaped city square[,]" and (3) "[a] tract of land kept in its natural state." Webster's II New College Dictionary 799 (1995). *See also City of Phoenix v. Harnish*, 214 Ariz. 158, 161, ¶ 8, 150 P.3d 245, 248 (App.2006) ("A park is typically defined as '[a]n area of land set aside for public use, as ... a large tract of rural land kept in its natural state and usually reserved for the enjoyment and recreation of visitors.'") (quoting The Ameri-

can Heritage Dictionary of the English Language (4th ed. 2000)).

¶ 66 Thus, neither the statutory definition of "public park" nor the ordinary meaning of "park" precludes the designation of a public park that includes a wastewater treatment facility. Indeed, as pointed out by the County, A.R.S. § 9–511(A) (2008), which authorizes municipalities to engage in business enterprises, permits governmental entities to "purchase, acquire and own real property for sites and rights-of-way for public utility and *public park purposes,* and *for the location thereon* of waterworks, ... water and sewage, and for plants for the manufacture of any material for public improvement purposes or public buildings." (Emphasis added). Thus, the statutory scheme contemplates that industrial facilities, such as a wastewater treatment facility, may be located within the boundaries of a public park.

¶ 67 Moreover, to the extent the Town argues that the County's designation of the MWRF and surrounding areas as a public park was merely a "political maneuver" to thwart its annexation into the Town, the superior court expressly acknowledged that the timing of the designation was prompted to avoid annexation, but found that the plan to convert the area into a public park had been planned for years. More importantly, as noted by the court, the Pima County Board of Supervisors' designation of Anza Park was essentially an exercise of its zoning power. As such, it was a legislative decision, and neither their motives nor the reasons presented to them for their action "are proper subjects for judicial inquiry." *Wait v. City of Scottsdale*, 127 Ariz. 107, 108, 618 P.2d 601, 602 (1980). Finally, it is undisputed that the County complied with all the statutory requirements pertaining to designating the area a park. Therefore, the superior court did not err by finding that the County acted within its authority by designating Anza Park and that the Town's subsequent annexation of the area, without approval from the County Board of Supervisors, was therefore defective and invalid.

### III. Attorneys' Fees

¶ 68 The Town contends Judge Mangum erred by awarding the County its attorneys'

fees and costs pursuant to A.R.S. § 12–341.01 (2003) because the Town, not the County, *should have been* the "prevailing party" in this matter. We have affirmed Judge Mangum's trial rulings and therefore affirm the award of attorneys' fees and costs to the County as the prevailing party.

## CONCLUSION

¶ 69 For the foregoing reasons, we affirm the superior court's rulings that the Town has the paramount statutory authority to provide sewer service to its residents, the scope of the IGA did not encompass the MWRF, and the Town's annexation of the area including the MWRF was invalid. We reverse, however, the superior court's ruling that the Town's 1988 special ballot measure satisfied A.R.S. § 9–514.

CONCURRING: PATRICIA A. OROZCO, Presiding Judge and JOHN C. GEMMILL, Judge.